**EXHIBIT C**

February 21, 2018

Chris Edwards
Assistant City Attorney
Austin City Attorney Office
City Hall, 301 W. 2nd Street, P. O. Box 1546
Austin, Texas 78767-1546

Expert Witness for the Defendant (City of Austin)

GRADY BOLTON
*Plaintiff*

v.

CITY OF AUSTIN, AUSTIN POLICE OFFICER RANDY DEAR, AUSTIN POLICE OFFICER MANUEL JIMENEZ, AUSTIN POLICE OFFICER MICHAEL NGUYEN & AUSTIN POLICE OFFICER ROLANDO RAMIREZ
*Defendants*

I have been retained by Attorney Chris Edwards as an expert witness in the above civil action. I am therefore submitting the following information and accompanying documents and methodology in support of my opinions and conclusions in response to your request for me to review materials related to this case on the issues involved.

**BACKGROUND AND EXPERIENCE**

At present, I am the Chief of Police for the Dallas Independent School District Police Department with a workforce of 220 personnel. This includes sworn officers, security officers and police dispatch. We have a $15 million operating budget. Dallas ISD is the 14th largest school district in the United States with a student population of 158,000.

Prior to becoming the Dallas ISD Police Chief, I was employed by the Dallas Police Department and served as the Deputy Chief of the Crimes Against Persons Division (CAPERS). In this assignment, I supervised 180 personnel with an operating budget of $18.5 million. I was responsible for all criminal investigations involving murder, robbery, sexual assaults, assaults and the CSI function for 1.3 million people. Before I was promoted to Deputy Chief, I was the Homicide Unit Commander. As the Homicide Commander, I directly oversaw 750 murder investigations, 300 suicides, 75 Officer Involved Shootings (OIS), Death in Custody incidents (DIC) and murder-for-hire investigations. As the Homicide Unit Commander, I also served as head of the Special Investigations Unit (responsible for all Officer Involved Shooting investigations) for the 9th largest police department in the United States.

I came to the Dallas Police Department in February 1982 after I graduated from the University of Memphis with a Bachelor's Degree in Criminal Justice. I worked my way through the Dallas Police Department ranks as a patrol officer, patrol sergeant, vice sergeant, patrol watch commander, narcotics unit commander, traffic division commander, bomb squad commander, and ultimately the homicide unit commander. I became a police patrol sergeant in 1986. During my first year as a sector sergeant, nine of the ten officers that I supervised were involved in Officer Involved Shootings in which either a suspect or officer was injured or killed. In my career, I served as a patrol sergeant, patrol lieutenant (watch commander) and Deputy Chief of Police. As a result of the many hours of experience and training I received, I have a very firm understanding of police operations from both the officer's position as well as police management.

When I became the Dallas ISD Police Chief, I incorporated new changes for use of force into the policy manual. My department is responsible for the safety and protection of 158,000 students and 20,000 employees. I am a graduate of the Southwest Legal Foundation Command Management Supervisors Course and the Law Enforcement Management Institute of Texas through Sam Houston State University New Police Chief Course. Additionally, I am a Master Texas Peace Officer with 36 years of experience, a TCOLE State Certified Instructor, and a Certified Analyst through Force Science Institute.

I have technical, professional and other specialized knowledge that will assist in understanding the facts and issues of the incident in question. My education, training and experience provides understanding of how law enforcement officers are trained as they are. Knowledge is the key to reaching a reliable evaluation of law enforcement officers' conduct. I have conferred with many other law enforcement experts regarding police operations and evaluations thereof. The facts and data on which I base my opinions are of a type reasonably relied upon by experts in the field of law enforcement in forming opinions or inferences.

The information and accompanying documents I have provided to the Court are truthful and accurate to the best of my knowledge.

Signed _____ Date: February 21, 2018
Craig R. Miller
Chief of Police

## DOCUMENTS REVIEWED FOR THIS ANALYSIS

On May 2, 2017, the Defendants' counsel, Chris Edwards, presented me with evidentiary documents for my review in preparation for opining on this case. She requested that I prepare a concise declaration outlining my basic opinions on this case. Those findings and opinions to date have been incorporated into this document.

It should be noted that before I agreed to be retained by the Defendant as an expert in this case, I insisted on conducting a preliminary review of key materials – including the Plaintiff's Original and 1st Amended Complaints and the APD General Offense Report – so that I could determine whether I could ethically offer opinions supportive of the Defendants. I conducted such a review and agreed to be retained by the Defendant.

As is usually the case in investigations such as this, I am aware that there may be additional documents or other evidence that might subsequently become available during the discovery process. I may be asked to review these as they may assist me in developing more detailed findings and opinions. Therefore, I reserve the right to amend my findings and opinions at some later date based upon my ability to review any additional records and/or items of evidence that I might subsequently receive.

The documents I have reviewed to date are listed below:

1. APD General Offense Report for incident involving Mr. Bolton
2. Photos of Mr. Bolton (APD photos/Travis Co photos/Bolton home photos
3. Plaintiff's Original Complaint
4. Plaintiff's 1st Amended Complaint
5. Plaintiff's Expert Report
6. Probable Cause Affidavit
7. *American Statesman* article regarding police on 6th Street
8. CD Containing:
   - Video of incident
   - Depo. Transcript of Sgt. Jimenez
   - Depo. Transcript of Officer Nguyen
   - Depo. Transcript/Video of Grady Bolton
9. Sgt. Jimenez's TCOLE Records
10. Officer Nguyen's TCOLE Records
11. Medical records from University Medical Center Brackenridge for Mr. Bolton
12. Austin Police Department General Orders Section 200
13. Cell phone video
14. Officer Ramirez's TCOLE Records
15. Sgt. Dear's TCOLE Records

## Summary of The Incident

On February 8, 2015, at approximately 2:15 AM, Austin Police Officer Paul Johnson was wearing a Class B marked Austin Police Department (APD) uniform patrolling the Austin 6th Street Entertainment district. While on his bicycle Officer Johnson was notified by a member of the Maggie Mae's bar staff at 323 East 6th Street that there was a disturbance in front of the bar involving a group of males who were refusing to leave the area. As Officer Johnson arrived at Maggie Mae's he was joined by APD Sergeant Jimenez who was also wearing a clearly marked APD Class B uniform.

Once at the front of Maggie Mae's, the witness went to get Officer Johnson and pointed out a group of approximately eight males who were standing in front of the bar. Officer Johnson spoke to one of these individuals as Sgt. Jimenez spoke with Mr. Grady Bolton. In Mr. Bolton's deposition, he stated the following (starting on page 22) as to why he was in Austin and his recollection of the events leading up to this point:

"Q:   What were you doing in Austin that night
A:   We were there for a bachelor party
Page 25:
Q:   OK, what time did you start drinking
A:   I would say about 1 o'clock
Q:   In the afternoon
A:   Yes, ma'am
Page 27:
Q:   So how many total drinks did you have on Saturday before this incident
A:   I don't know
Q:   Was it more than the five you've stated
A:   Yes, ma'am
Q:   Was it more than 10
A;   No ma'am
Q:   So was it between 5 and 10
A:   Yes ma'am"[1]

As Mr. Bolton's deposition continued, he recalled how he got to the front of Maggie Mae's where he eventually made contact with APD:

"Q:   And then another employee carried you out in a bear hug, is that correct?
A:   Yes, ma'am
Q:   So from the front he grabbed you and put his arms around you, lifted you up, and carried you out the front door?
A:   Yes, ma'am

---

[1] Grady Bolton's Deposition

Q:    And what did you do?
A:    Whenever they set me down, I waited for my friends to walk outside
Q:    Just quietly?
A:    I don't remember, I don't know
Q:    You weren't mouthing off to the employee?
A:    I don't remember
Q:    I thought you said you remembered this night very well.
A:    I don't remember that part "[2]

As Sgt. Jimenez was spoke with Mr. Bolton, he informed him that officers were flagged down because of a disturbance involving Mr. Bolton and his group and that they just needed to leave so that no further altercations would occur. The APD General Offense prepared by Officer Johnson, described what happened at that point:

"Bolton took a defiant stance and told Sgt. Jimenez that he did not need to leave. Bolton said 'I know my rights and we are standing and talking'. Sgt. Jimenez stated to Bolton that they were flagged down on a disturbance involving Bolton and his group and that they need to leave so no further altercations occurred. Bolton asserted that he was not breaking the law and he was not going to leave. Bolton again repeated that he knew his rights. Sgt. Jimenez stated that Bolton was about to go to jail. Bolton inquired 'for what'. I stated 'Disobey a Lawful Order". Bolton said "I'm not going anywhere'. At this point I grabbed Bolton's left wrist to handcuff him and arrest him for violation of city ordinance, Disobey a Lawful Order. Once I grabbed Bolton's wrist, he tensed up and pulled his wrist to his chest, pulled back and twisted. Sgt. Jimenez also grabbed his arm and another officer attempted to get Bolton's right arm. Bolton was surrounded by friends and Bolton is 6'3" 210 lbs. Bolton was actively resisting using the strength of his muscles to prevent officers from putting his hands behind his back and cuffing him. I used a closed fist and struck Bolton in the left side of the neck to effect a Brachial Stun. Bolton stepped back and I punched again on the left side of the neck and the Brachial Stun was effective and Bolton's legs gave out and he went to the ground. I am not sure if Bolton hit his head on the ground. I then went for Bolton's arms to put him into handcuffs. Bolton was face down and I was able to get a hold of his right arm and place a set of handcuffs on it. Bolton's left arm was above his head and he was using his strength to prevent officers from gaining control or moving his left arm."[3]

During this altercation, Sgt. Jimenez informed Mr. Bolton that he was under arrest for public intoxication and instructed him to stop resisting. Sgt. Jimenez's deposition states, the following on page 36:

---

[2] Grady Bolton Deposition

[3] Paul Johnson's General Offense Report

6

"His balance was unsure, his eyes were glassy, strong odor—strong odor of alcohol on his breath, argumentative, unable to reason. Things we commonly see from drunk people downtown."[4]

As Sgt. Jimenez and Officer Johnson were struggling with Mr. Bolton, the crowd surrounding the incident continued to grow as bars began to close and their patrons spilled into the streets. Officer Nguyen observed the altercation from 50 yards away and proceeded to the scene to help the officers. As Nguyen arrived, he observed that Officer Johnson was having difficulty gaining control of Mr. Bolton's arms while attempting to handcuff him. In his deposition, Officer Nguyen states the following on page 21: "We fall to the ground, and after falling to the ground Mr. Bolton rolls over on his stomach and puts his arms underneath by his chest and chin."[5] On page 22 Officer Nguyen was asked the following:

"Q: So what—you've said you believe he's intoxicated. What about Grady Bolton caused you to believe he was intoxicated?
A: I recall the strong odor of, like, metabolized alcohol coming from him
Q: Anything else?
A: No ma'am
Q: Did—okay, so he fell to the ground. What happened after he fell to the ground?
A: After he fell to the ground I—he put his hands underneath his body where his chest and his chin are and his arms are close to his body, and I recall I was trying to grab his left wrist out from underneath him and I'm pulling, but he is using muscular strength to resist me, and I'm telling him to give me his arm. However, he continues to use muscular strength to resist giving me his arm."[6]

As Officer Nguyen attempted to gain control of Mr. Bolton's arms, he delivered a set of two knee strikes to Mr. Bolton's shoulder in an attempt to remove Bolton's arms from under his body, while simultaneously commanding him to give him his hands. The first set of knee strikes had no effect as Officer Nguyen continued to feel the tension in Mr. Bolton's arms. Officer Nguyen then delivered a second set of two more knee strikes to Mr. Bolton's shoulder that were successful. Officer Nguyen was finally able to get Mr. Bolton's hands cuffed behind his back. After Mr. Bolton was handcuffed, he was moved by Officers Johnson, Ramirez, Nguyen and Sgt. Jimenez one block over onto Trinity Street to allow the officers to get away from the hostile crowd.

In Officer Ramirez's supplement to the General Offense he stated the following:

---

[4] Sgt. Jimenez Deposition
[5] Officer Nguyen's deposition
[6] Officer Nguyen's deposition

"The crowd grew bigger and louder so we made the decision to get the subject out of the area. We grabbed the subject by the shoulders and legs and carry him away from the crowd. We carry the subject to the Southeast corner and sitting him up on the curb against the concrete flower pot. The subject was still refusing to cooperate and would not assist us in sitting down on his own." [7]

Later in the General Offense Supplement Officer Ramirez stated the following:

"Bolton stated to me that he was sorry for what he did and he did not mean to disrespect us. I told him that I was not the one who had arrested him. I told him that I did not understand the reason why he had not left the area when he was asked and why he was not walking on his own. Bolton stated that he was sorry and that he should have listened."[8] As Mr. Bolton was waiting to be transported Sgt. Dear arrived at the scene to speak with Mr. Bolton after he was handcuffed. In Sgt. Jimenez's deposition (p. 55) he states the following regarding why Sgt. Dear came to the scene: "Since I was part of the response to resistance, I'm not allowed to review or say it was good or not good or justified under the policy. I would have to call, by policy, another supervisor to review my actions and the other officers' actions."[9]

Following his arrest, Mr. Bolton was transported by Caritas to the Travis County Jail. Once at the jail, Mr. Bolton was refused admittance by the jail nurse because Mr. Bolton asserted that he had gone unconscious during his arrest. Mr. Bolton was then transported by Officer Johnson to the University Medical Center Brackenridge. Once at the Brackenridge facility it was determined that Mr. Bolton had facial contusions, which meant a bruise with swelling and possibly bleeding under the skin. On page 18, in the Quick Look Triage Documentation of his medical report it states chief complaint: "pt denies pain." [10] Under the section titled Emergency Physician Record history it states that Mr. Bolton was "uncooperative."

On page 33 of the report under the section titled Serum Toxicology it shows the results for the alcohol level in Mr. Bolton's system at 5:48 AM (3.5 hours after his arrest):

"Ethanol Level           260 mg/dl
less than 50 mg/          INDICATES LITTLE OR NO IMPAIRMENT
5- - 100 mg/dl            INDICATES SLIGHT TO MODERATE IMPAIRMENT
150 – 350 mg/dl           TOXIC
Greater than 35 mg/dl     COMA"[11]

---

[7] Officer Ramirez's Offense Supplement

[8] Officer Ramirez Supplement to General Offense

[9] Sgt. Jimenez's Deposition

[10] Brackenridge Medical Report

[11] Brackenridge Medical Report

In reviewing this scale, Mr. Bolton's Ethanol Level of 260 mg/dl is classified as TOXIC. "To convert ethanol level to BAC, move the decimal point 3 places to the left. Example a 100 mg/dl serum ethanol level is equivalent to a .10 (g/dl) BAC, or ).10% (weight/volume)"[12] Based on this formula, 3.5 hours after being arrested, Mr. Bolton's blood alcohol level was a .26.

After being treated at University Medical Center Brackenridge, it was determined that Mr. Bolton suffered no broken bones and required no stitches. He did have facial contusions and was instructed to take Motrin 800 mg. On Sunday night Mr. Bolton was released from the Travis County jail.

## EXPERT'S OPINIONS & FINDINGS

The principles of excessive force/deadly force are thoroughly documented by several different law enforcement organizations. The names of these organizations that I draw my opinions from include the Federal Bureau of Investigation (FBI), the International Association of Chiefs of Police, the Texas Police Chiefs Recognition Program, Force Science Research Center and the Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA). All of these organizations help to establish guidelines for law enforcement standards and specify the "Use of Force" to be used in controlling arrest situations.

I used these basic law enforcement standards when I looked at the force used by Austin Police Officers Ramirez, Johnson, Nguyen and Sergeant Jimenez in reviewing this case. When studying best practices, the one common theme is that there is no standard that all law enforcement agencies must follow. The one central question that must be answered in any situation is "what would a reasonable officer do, given the same circumstances?" In a *USA Today* article from October 2017 titled "Reasonable force isn't perfect force:" Opposing view it states the following:

"Our nation has more than 18,000 jurisdictions, each of which may have different use of force policies based on their training, enforcement needs and equipment availability. However, the foundation of every one of these policies is *Graham's* objectively reasonable standard. The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight…No federal statute or federally imposed regulation can supplant the existing standard. In *Graham*, then Chief Justice William Rehnquist, citing an earlier decision, spoke directly to this issue. The test of reasonableness …is not capable of a precise definition or mechanical application."[13]

---

[12] emedicine. Mediscape.com/article
[13] *USA Today* article from October 2017, Reasonable force isn't perfect force: Opposing view

**OPINION #1 (The Adequacy of Officers Johnson, Ramirez, Nguyen and Sergeant Jimenez's Training)**

It is my opinion that I hold to a reasonable degree of certainty, that Officers Johnson, Nguyen, Ramirez and Sgt. Jimenez were all provided exceptional training by the Austin Police Department regarding the use of force. The APD is in the top 1% of the largest police departments in the United States with 2,600 sworn officers and their own police academy. As a current Chief of Police, I have the utmost respect for the quality training that takes place with APD.

In my experience as an expert witness and in my extensive training through the Law Enforcement Management Institute (LEMIT – Sam Houston State University) Police Chief training courses, it is my opinion that APD does an outstanding job of training its officers compared to other agencies, particularly in the area of "Use of Force." The APD provides excellent training that includes Reality Based Situational Training to recruits and in-service officers. The goal of the APD Academy is to put recruits through as much realistic stress as they can in the exercises they conduct with recruits. Officers Johnson, Ramirez, Nguyen and Sgt. Jimenez all graduated from the APD Academy. The APD Academy in my professional opinion, is a very advanced and professional academy that currently puts officers through 32 weeks of training. These 32 weeks are more than twice as much as the 643 hours that the Texas Commission on Law Enforcement (TCOLE) requires in order to become a licensed Texas Peace Officer. In a July 2016 Bureau of Justice Bulletin regarding training on a national level it states, "Excluding any required field training, the length of a basic law enforcement program was about 840 hours or 21 week."[14] After their academy graduation, all APD officers are then required to complete another 12 weeks of field training with an Field Training Officer (FTO) and then will work in a probationary status after being released from field training.

It is my opinion that the training Officers Johnson, Ramirez, Nguyen and Sgt. Jimenez received in the Austin Police Academy was very advanced in the area of instruction that focused on the use of force. In fact, they not only received 40 hours of classroom instruction but also participated in multiple hours of hand-to-hand ground fighting in their courses of instruction. In the APD Academy each of these officers were participants in multiple scenarios where they were put in a position of having to role play and act out situations where officers are expected to make split second decisions in the course of their jobs. These scenarios included making arrests when dealing with intoxicated citizens.

All APD officers receive and are tested on their knowledge of General Orders Section 200 that deals specifically with response to resistance. In 200.01 Purpose and Scope it states:

---

[14] July 2016 Bureau of Justice Article, State and Local Law Enforcement Training Academies, 2013

"This order recognizes that the use of force to resistance by law enforcement requires constant evaluation and that response to resistance is a serious responsibility. The purpose of this order is to provide officers with guidelines on objectively reasonable response to resistance. While there is no way to specify the exact amount or type of objectively reasonable force to be applied in any situation, each officer is expected to use these guidelines to make decisions in a professional, impartial, and objectively reasonable manner." [15] Officers, Johnson, Nguyen, Ramirez and Sgt. Jimenez also received training and were tested on their knowledge of Section 200.02:

**200.02 De-Escalation of Potential Force Encounters**

"When safe and reasonable under the totality of circumstances, officers shall use de-escalation techniques to reduce the likelihood for force and increase the likelihood of voluntary compliance.

Nothing in this de-escalation policy requires an officer to place themselves in harm's way to attempt to de-escalate a situation. Recognizing that circumstances may rapidly change, officers may need to abandon de-escalation efforts after they have commenced. Understanding that no policy can realistically predict every situation an officer might encounter, the Department recognizes that each officer must be entrusted with reasoned discretion in determining the reasonable de-escalation techniques to use in a situation."[16]

It is my professional opinion that Officer Johnson and Sgt. Jimenez were following General Order 200.01 when they encountered Mr. Bolton in front of Maggie Mae's bar on February 8, 2015. Sgt. Jimenez first spoke with Mr. Bolton because he had been summoned by the bar's management to come and help them with a unruly group in front of the bar. Sgt. Jimenez instructed Mr. Bolton that it was time for him and his group to leave the scene because the street would be opening soon. Had Mr. Bolton and his group followed Sgt. Jimenez's instructions, this incident would never have occurred. However, Mr. Bolton became verbally argumentative and escalated the situation into a physical altercation. Just as General Order 200.02 states, "nothing in this de-escalation policy requires an officer to place themselves in harms way to de-escalate a situation."[17]

Officers Johnson, Ramirez, Nguyen and Sgt. Jimenez all received training and were tested on APD General Order 206.06

---

[15] APD General Orders 200
[16] APD General Orders 200.02
[17] APD General Order 200.02

**206.6 Pain Compliance Techniques**

"Pain compliance techniques may be effective in controlling a passive or actively resisting individual. Officers may only apply those pain compliance techniques for which the officer has objectively reasonable belief that the use of such a technique appears necessary to further a legitimate law enforcement purpose."[18]

Throughout my review of this incident I have seen Mr. Bolton's size described as 6'3" 210 lbs. to 6'4" 240 lbs. Both descriptions indicate that Mr. Bolton is a large male, who was high highly intoxicated and angry on the night of his arrest. It is my professional opinion that the brachial stun delivered to Mr. Bolton's neck by Officer Johnson was an appropriate technique and necessary to bring Mr. Bolton to the ground so that officers could control him more easily. Based upon General Order 206.6, I believe the set of knee strikes delivered by Officer Nguyen was in compliance with the training he had received at the APD Academy.

In the APD, Officers Johnson, Ramirez, Nguyen and Sgt. Jimenez all received training at the Academy and through in-service training courses dealing with the Texas Penal Code. A part of this instruction includes that officer's awareness of Texas Penal Code 38.03, Resisting Arrest, Search or Transportation. Texas Penal Code 38.03 it states the following:

"(a) A person commits an offense if he intentionally prevents or obstructs a person he knows is a peace officer or a person acting in a peace officer's presence and at his direction from effecting an arrest, search or transportation of the actor or another by using force against the peace officer or another.
(b) It is no defense to prosecution under this section that the arrest or search was unlawful."

It is my opinion, that Officers Johnson, Ramirez, Nguyen and Sgt. Jimenez were following the training they received as APD officers concerning the offense of Resisting Arrest when they executed the arrest of Mr. Bolton. In reviewing the General Offense and supplements written by Officer Johnson and Officer Ramirez along with the depositions of Officer Nguyen and Sgt. Jimenez, it is clear that APD provided each of them with training which they followed with regards to the appropriate use of force and effecting an arrest. Additionally, it is my opinion that the actions of Officers Johnson, Ramirez, Nguyen and Sgt. Jimenez were reasonable in light of the situation as it unfolded on February 9, 2015.

---

[18] APD General Order 206.6

## OPINION #2 (The Austin Police Department Provides Specific Guidelines on When Officers Can Use Force)

It is my professional opinion which I hold to a reasonable degree of certainty, that the APD has an outstanding police policy with regards to use of force. The policy is captured in Section 200 of the APD General Orders titled Response to Resistance. This policy is in compliance with CALEA standards, which is believed to be one of the blueprints that provide departments like APD an opportunity an established set of professional standards. The 200 Section of the General Orders is taught in the academy to all officers and is then reinforced throughout their careers during annual in-service training.

### 200.1.1 Philosophy

"The use of force by law enforcement personnel is a matter of critical concern both to the public and to the law enforcement community. Officers are involved on a daily basis in numerous human encounters and when warranted, may exercise control of another in carrying out their duties." The APD also uses a very common sense definition of what is or what should be considered objectively reasonable. "An objective standard viewed from the perspective of a reasonable officer on the scene, without the benefit of 20/20 hindsight, and written within the limitations of the totality of the circumstances presented at the time of the incident."[19]

It is my opinion that in officer/suspect encounters like the one Officers Johnson, Ramirez, Nguyen and Sgt. Jimenez experienced with Mr. Bolton, things happen literally in the blink of an eye, Officers automatically default back to how they were trained coupled with what it takes to survive an encounter. In this altercation Mr. Bolton, a very large male who was angry and highly intoxicated, refused to comply with the officer's instructions. By all officer involved accounts he failed to comply with their commands. Focusing on the training each of these officers learned, they followed General Order 200.3.2 when they arrested Mr. Bolton:

### 200.3.2 Use of force to Affect a Detention, an Arrest or to Conduct a Search

"An officer is justified in using reasonable force when the officer reasonably believes the use of such force is immediately necessary (Tex. Penal Code 9.51 (a):
  (a) To make or assist in a detention or an arrest, or conduct a search that the officer reasonably believes in lawful;
  (b) To prevent or assist in preventing escape after an arrest, provided the officer reasonably believes the arrest or search is lawful: or
  (c) To make an arrest or conduct a search under warrant that the officers reasonably believes is valid."[20]

---

[19] APD General Order 200.1.2
[20] APD General Order 200.3.2

It is my opinion that when the officers arrested Mr. Bolton, they followed their extensive their training aligned with the Texas Penal Code 9.51 sections (a) and (b).

**211.2 Determining the Correct Force Level**

Force levels are broken up into three types: Level 1, Level 2 and Level 3. Each level is defined below by the response to resistance used in the incident. These levels are established for inquiry, reporting, and review purposes only. If there is uncertainty about which level to designate a particular incident, then the higher level shall be used.

211.2.3 Level 3 Force Incidents

"(f) A weaponless technique is used with or without complaint of injury or pain. (A strike to the head is a level 2). Examples of weaponless techniques include:
  1. Hand/palm/elbow strikes
  2. Kicks or leg sweeps
  3. Pressure points
  4. Take-downs"[21]

In the General Offense report generated by Officer Johnson it states the following:

"Bolton was intoxicated by alcohol and his mental state was, from what the complainant had told us, angry. It was unknown whether Bolton had any weapons proximal or concealed on his person. Bolton was effectively restrained in that my force was a Level 3 for someone who had empty hand active resistance. A Brachial Stun was appropriate to take Bolton down because a physical takedown on a subject of his stature would take the coordination off all present officers and usually involves sending the subject and the officers to the ground with great force. A Brachial Stun, when employed effectively, simply sends the subject crumpling to the ground. A Brachial Stun was also prudent over a standard type of takedown as Bolton was surrounded by friends could easily prevent their friend from going to the ground."[22]

In this incident involving Mr. Bolton, it is my opinion that all of the involved officers were following training they had received with APD when they arrested Mr. Bolton. Based upon the General Offense, Officer Johnson felt the Brachial Stun to the neck was a Level 3 technique and necessary to control Mr. Bolton. Once on the ground as Mr. Bolton continued to resist Officer Nguyen. Nguyen then deployed two sets of knee strikes to Mr. Bolton in order for him to remove Bolton's hands from under his body so that he could be handcuffed.

---

[21] APD General Order 211
[22] APD General Offense

In a Police Magazine.com article titled "Handling People Under the Influence", it states the following, "As any veteran officer can tell you, the person who has had his judgment scrambled and his inhibitions weakened by alcohol or drug ingestion is capable of doing things-including attacking a police officer- that he might never even consider when straight or sober. With her judgment impaired by the effects of drugs or booze, a 90-pound woman may take on three burly officers. If you remember nothing else about drunk or drugged people, remember this: They are absolutely unpredictable."[23]

It is my opinion that the Austin Police Department provided Officers Johnson, Ramirez, Nguyen and Sgt. Jimenez with excellent guidelines on when/how to utilize force, which they effectively followed, when they arrested Mr. Bolton. It is further my opinion that the actions of Officers Johnson, Ramirez, Nguyen and Sgt. Jimenez were reasonable, appropriate and consistent with nationally accepted standards under these circumstances. As the *Graham v Connor* case pointed out, "the calculus of reasonableness must embody allowance for the fact that officers are forced to make split second judgments in circumstances that are tense, uncertain and rapidly evolving – about the amount of force that is necessary in a particular situation."[24]

### OPINION #3 (Opinion Concerning the Use of Force Actions of Officers Johnson, Ramirez, Nguyen and Sgt. Jimenez)

Based upon cell phone video, the General Offense Report and the depositions I reviewed, I was able to form my opinion as to the events that led up to the use of force by the officers involved. After being notified by Maggie Mae's personnel about a disturbance in front of the bar, Officer Johnson and Sgt. Nguyen arrived.

"Sgt. Jimenez stated to Bolton that they were flagged down on a disturbance involving Bolton and his group and that they need to leave so no further altercations occurred. Bolton asserted that he was no breaking the law and he was not going to leave. Bolton again repeated that he knew his rights. Sgt. Jimenez stated that Bolton was about to go to jail. Bolton inquired 'for what'. I stated 'Disobey a Lawful Order". Bolton said "I'm not going anywhere'. At this point I grabbed Bolton's left wrist to handcuff him and arrest him for violation of city ordinance, Disobey a Lawful Order. Once I grabbed Bolton's wrist, he tensed up and pulled his wrist to his chest, pulled back and twisted. Sgt. Jimenez also grabbed his arm and another officer attempted to get Bolton's right arm. Bolton was surrounded by friends and Bolton is 6'3" 210 lbs. Bolton was actively resisting using the strength of his muscles to prevent officers from putting his hands behind his back and cuffing him. I used a closed fist and struck Bolton in the left side of the neck to effect a Brachial Stun. Bolton stepped back and I punched again on the left side of the neck and the Brachial Stun was effective and Bolton's legs gave out and he went to the ground. I am not sure if Bolton hit his head on the ground. I then went for Bolton's arms to put him into

---

[23] *PoliceMag.com*, 2006, "Handling People Under the Influence"
[24] *Graham v Connor*, 490 U.S. 386-396-97

handcuffs. Bolton was face down and I was able to get a hold of his right arm and place a set of handcuffs on it. Bolton's left arm was above his head and he was using his strength to prevent officers from gaining control or moving his left arm".[25]

In an article from the USDOJ concerning use of force it states the following: "There is no single, universally agreed upon definition of use of force. The International Association of Chiefs of Police has described use of force as the amount of effort required by police to compel compliance by an unwilling subject. Officers receive guidance from their individual agencies, but no universal set of rules governs when officers should use force and how much."[26]

When looking at this incident in its totality, it is my opinion which I hold to a degree of professional certainty that Officers Johnson, Ramirez, Nguyen and Sgt. Jimenez used the proper amount of force necessary to arrest Mr. Bolton. Each of these officers were acting in their capacity as sworn police officers for the Austin Police Department, and their actions were appropriate in light of the facts and circumstances confronting them while attempting to arrest Mr. Bolton. It is also important to note that at the time the officers were arresting Mr. Bolton, they were considering all factors of the circumstances of the environment around them. There was a large crowd, including his friends and bar patron, growing and the officers felt they needed to effect the arrest and remove Mr. Bolton from the immediate scene for their own safety. The cell phone video of the incident does not capture the moments leading up to Mr. Bolton's arrest, or the actual arrest itself. The video is of poor quality and its low lighting makes it impossible to accurately see what is taking place as Mr. Bolton struggles with the officers. The video's audio does capture obscenities between the crowd and Officer Johnson. However, Officer Johnson is not listed as a defendant in the lawsuit involving Mr. Bolton.

The following is a summary of the force used during the arrest of Mr. Bolton based on officers' depositions and police reports.

- Sgt. Dear never touched Mr. Bolton and only spoke to him following his arrest.

- Officer Ramirez never touched Mr. Bolton while he was being handcuffed. Officer Ramirez only assisted in carrying Mr. Bolton to Trinity Street.

- Sgt. Jimenez was the first officer to speak to Mr. Bolton. Sgt. Jimenez executed an unsuccessful leg sweep while attempting to handcuff Mr. Bolton.

---

[25] Paul Johnson's General Offense Report
[26] USDOJ, Law Enforcement, Police Use of Force, modified Nov 2016

- Officer Nguyen delivered two sets of knee strikes to Mr. Bolton's shoulder in order to gain control of his arm so that he could be arrested. These knee strikes were within the Level 3 control tactics 211.2.3 that officer Nguyen was taught by APD.

- Officer Johnson delivered the Brachial Stun to Mr. Bolton that ultimately took Mr. Bolton to the ground. (Officer Johnson is not listed as a defendant on the lawsuit involving Mr. Bolton).

**OPINION #4 (The Austin Police Department Policy for Supervisory Review of Level 3 Incidents was Followed)**

It is my opinion that APD Sergeant Jimenez followed General Order 211.5 and 211.8 with regards to the incident involving Mr. Bolton.

**211.8 Level 3 Incident Inquiry, Reporting and Review Requirements**

Level 3 force incidents require the involved employees to document the incident in a report and notify their supervisors. Supervisors shall conduct a review of Level 3 force incidents as outlined below but may upgrade any Level 3 force incident to Level 2 force incident in order to conduct a more extensive review.

(a) Supervisors shall respond to the scene of any Level 3 incident involving:
1. Use of OC spray or other chemical agent on a subject
2. Use of a TASER Device. See the "Report of Use" section of General Order 208 (TASER Guidelines) for specific information to be included in the report.
3. Use of Impact Weapon
4. Any incident resulting in injury or complaint of paid beyond the temporary discomfort of un-resisted handcuffing. Supervisors shall review the general circumstances of the incident with the involved personnel and ensure the reporting level is correct based on the facts.

**211.5 Designation of Supervisor to Conduct Inquiry**

The supervisor of the employee involved in the force incident shall typically be the primary supervisor conducting the force inquiry. The following exceptions apply:

(b) A supervisor involved in a force incident shall not review the incident. A supervisor who is at the scene and witnesses the incident, but is not directly involved in the force, may conduct the inquiry.
(c) If an employee the rank of sergeant or lieutenant is involved in a Level 2 or 3 force incident, another supervisor the rank of the involved employee or higher shall conduct the inquiry.

After Mr. Bolton was arrested, he was moved over onto Trinity Street to wait for transport. At this location, Sgt. Jimenez requested that Sgt. Dear come to the scene to speak with Mr. Bolton.

When asked why he requested another supervisor come to the scene he states the following in his deposition on page 54:

Q: "So Sergeant Dear is also in a supervisory capacity that night night in the same location downtown?
A: He was an evening shift sergeant
Q: Is that separate from you?
A: I'm night
Q: Okay
A: He would get off around 3:00 in the morning. I would get off around 8:00.
Q: Okay. So—but that's what this is, then. That's Dear going in and looking at everybody's—
A: Or making notes. Because he – since I was part of the response to resistance, I'm not allowed to review or say it was good or not good or justified under policy. I would have to call, by policy, another supervisor to review my actions and the other officers' actions."[27]

It is my opinion that APD is very transparent by requiring that another uninvolved supervisor be required to investigate force incidents in which a supervisor is involved in the use of force. It is further my opinion that in the incident involving the arrest of Mr. Bolton that APD Section 211 was followed by Sgt. Jimenez and Sgt. Dear.

**CONCLUSION**

Policing entertainment venues like 6th Street in Austin is challenging for law enforcement. In areas like 6th Street, police officers have to balance the function of keeping people safe while attempting to accommodate the businesses that operate in the area. While working for the Dallas Police Department I supervised officers who worked in the Dallas Central Business District. One of their primary functions was to monitor entertainment districts such as 6th street in Austin where alcohol is sold and people are often involved in disturbances at closing time. I personally worked many events in the Central Business District where I was directly involved with arresting intoxicated individuals who were leaving from bars at closing time.

In a recent story written by the *Austin Statesman* from December 20, 2017, it says that the number of requests for police service are down in the time period the data was collected January – May:

---
[27] Sgt. Jimenez Deposition

2015  1,016
2016  920
2017  872

It is my opinion, which I hold to a reasonable degree of professional certainty, that the Austin Police Department (APD) is a very progressive and professional police department.  As a current police chief I believe their General Orders provide guidance for police personnel and are very comprehensive.  Based upon the statements, depositions, reports and the cell phone video, it is my opinion that the use of force to control Mr. Bolton was consistent with national standards based on the facts that were apparent to Officers Johnson, Ramirez, Nguyen and Sgt. Jimenez

On February, 8, 2015, Officer Johnson and Sgt. Jimenez responded to a request from Maggie Mae's bar to help a group of people involved in a disturbance to leave as the bar was closing.  Upon arrival Mr. Bolton was just instructed to leave but he refused and escalated the situation by not following the officer's instructions.  Had Mr. Bolton merely complied with the officer's request he would not have been arrested.  It was Mr. Bolton who in his own deposition stated that he was forcibly carried from inside the bar onto the street, by bar personnel.  Also Mr. Bolton stated that he was in Austin to attend a bachelor party on February 8, 2015 and that he started drinking at 1 PM or 13 hours before the incident at Maggie Mae's at 2:15 AM.  Then once a decision was made to arrest Mr. Bolton, it was Mr. Bolton who resisted arrest by not allowing the officers to place his hands behind his back.  Once Mr. Bolton was finally handcuffed he was transported to the jail where he alleged he had gone unconscious, which necessitated that he be transported for additional medical attention at University Medical Center Brackenridge.   Once at Brackenridge his behavior was listed as uncooperative by the staff and he was ultimately diagnosed with facial contusions and prescribed Motrin as his medication.  AT 5:48 AM Mr. Bolton had his blood drawn (3.5 hours after arrest) by staff at the hospital.
It was following this blood draw that Mr. Bolton's BAC was a .26 or listed in the TOXIC category according to hospital guidelines.

APD documented commendable transparency by sending Corporal Mears to the University Medical Center Brackenridge to photograph and document Mr. Bolton's injuries as they appeared the night of his arrest.

It is my professional opinion that Officers Johnson, Ramirez, Nguyen and Sgt. Jimenez were following their APD training and were justified when they used force that was appropriate to arrest Mr. Bolton. Also, I was not supplied any documentation that Mr. Bolton has ever contacted Internal Affairs to make a formal complaint against any of the officers involved in this incident.

- **COMPENSATION**

Compensation for my expert witness services is $300 per hour. This is a preliminary report and may have to be supplemented when more information is available.

- **Resume – Attached**
- **List of Cases in which I have been retained - Attached**

Submitted by,

*[signature]*

Craig R. Miller