**EXHIBIT D**

Manuel S. Jimenez - 12/19/2017



**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

GRADY BOLTON,                          §
                                       §
           Plaintiff,                  §
                                       §
                                       §
                                       § CIVIL ACTION NO.
VS.                                    § 1:17CV00077
                                       §
                                       §
CITY OF AUSTIN, ET AL.,                §
                                       §
           Defendants.                 §

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

ORAL DEPOSITION OF
MANUEL S. JIMENEZ

December 19, 2017

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

**Page 2**

ORAL DEPOSITION OF MANUEL S. JIMENEZ, produced as a witness at the instance of the PLAINTIFF, and duly sworn, was taken in the above-styled and numbered cause on December 19, 2017, from 1:55 p.m. to 3:30 p.m., before Brenda J. Wright, RPR, CSR in and for the State of Texas, reported by machine shorthand, at the City of Austin Law Department, 301 West Second Street, Fourth Floor, Austin, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached herein.

**Page 3**

APPEARANCES

For the Plaintiff:
    Ms. Daphne Pattison Silverman
    THE SILVERMAN LAW GROUP
    501 North IH-35
    Austin, Texas 78702
    512-485-3003/512-597-1658 (fax)
    rwhitmarshwilson@gmail.com

For the Defendants:
    Ms. Chris Edwards
    CITY OF AUSTIN LAW DEPARTMENT
    301 West Second Street
    Fourth Floor
    Austin, Texas 78701
    512-974-2268
    chris.edwards@austintexas.gov
    carol.smith@austintexas.gov

Also Present:
    Ms. Rebecka Whitmarsh-Wilson
    THE SILVERMAN LAW GROUP
    Ms. Andrea Underwood
    CITY OF AUSTIN LAW DEPARTMENT

**Page 4**

STIPULATIONS

The attorneys for all parties present stipulate and agree to the following items:

That the deposition of MANUEL S. JIMENEZ is being taken pursuant to Notice;

That the deposition is being taken pursuant to the Federal Rules of Civil Procedure;

That the original transcript will be submitted to the witness' attorney; Ms. Chris Edwards;

That the witness or the witness' attorney will return the signed transcript to the court reporter within 30 days of the date the transcript is provided to the witness' attorney.  If not returned, the witness may be deemed to have waived the right to make the changes, and an unsigned copy may be used as though signed.

Manuel S. Jimenez - 12/19/2017

---

**Page 5**

INDEX

                                    PAGE
                                    MARKED

APPEARANCES                          3

STIPULATIONS                         4

MANUEL S. JIMENEZ

  Examination by   Ms. Silverman       6

Changes and Corrections              73
Signature Page                       74
Reporter's Certificate               75


                  EXHIBITS

EXHIBIT  DESCRIPTION                 PAGE
NO.                                  MARKED
 1     Notice                         6

---

**Page 6**

1      (Deposition Exhibit No. 1 marked.)
2           (Witness sworn.)
3           MS. SILVERMAN:  And the case caption
4  information.  If you could put that info.  We'll just
5  do it with the notice of deposition.  So I have marked
6  Exhibit 1 as the notice of deposition.
7           MANUEL S. JIMENEZ
8  having been first duly sworn, testified as follows:
9           EXAMINATION
10 BY MS. SILVERMAN:
11     Q.   And then Officer Jimenez, you received a
12 copy of this, the notice of deposition?
13     **A.   Yes, ma'am.**
14     Q.   On the third page there were a list of
15 documents in case you hadn't produced everything.
16 Have you actually given everything to your lawyer to
17 give to us?  Notes and all?
18     **A.   It was not a timely submission, so I was**
19 **advised by Ms. Edwards that we didn't have the time to**
20 **submit everything.**
21     Q.   See, in the past, though, there was
22 discovery requests that were made.  This is just
23 confirming those.  Were there any documents you didn't
24 provide to your lawyer that relate to this case?
25     **A.   No.**

---

**Page 7**

1      Q.   All your notes -- she has all of your notes?
2      **A.   Yes, ma'am.**
3      Q.   And all your reports.  Right?
4      **A.   Yes, ma'am.**
5      Q.   Do you carry with you a little notepad, the
6  old fashioned thing, and make any notes with it or --
7      **A.   No.  I haven't had one in quite some time.**
8      Q.   Something you used to do?
9      **A.   Yes, ma'am.**
10     Q.   Things have changed with computers, huh?
11     **A.   Yes, ma'am.**
12     Q.   All right.  Then in this particular case,
13 though, you've -- you were not carrying a little
14 notepad at that time?
15     **A.   Not that I recall, ma'am.**
16     Q.   Have -- previous lawsuits, have you ever
17 been sued before?
18     **A.   No.**
19     Q.   Ever sued anybody before?
20     **A.   No.**
21     Q.   First time to give a deposition?
22     **A.   Yes, ma'am.**
23     Q.   She's taking everything down, as you saw the
24 other day.  And it's easier, like you're doing, just
25 to answer after I've asked the question.

---

**Page 8**

1           Full name, what's your full name?
2      **A.   Manuel Santiago Jimenez.**
3      Q.   And your date of birth?
4      **A.   10-7-75.**
5      Q.   And the address on your driver's license?
6      **A.   Seven --**
7           MS. EDWARDS:  Objection.  I'm
8  instructing the witness not to answer.
9           MS. SILVERMAN:  We need that address in
10 order to be able to run his record, subject to the
11 protective order and subject to the added protection
12 that I will give it to nobody other than my paralegal.
13          MS. EDWARDS:  No.  Pursuant to
14 Chapter 143, the officer is not disclosing his home
15 address.
16     Q.   (BY MS. SILVERMAN)  Do you have any criminal
17 arrest history yourself?  Ever been arrested?
18     **A.   No, ma'am.**
19     Q.   You're like, what does that mean?  That's
20 when somebody puts the cuffs on you.
21     **A.   Citations?**
22     Q.   Any citations?
23     **A.   Well, I mean, technically that's a form of**
24 **arrest, though.  I'm not sure if you're looking for**
25 **that.**

---

Manuel S. Jimenez - 12/19/2017

9

1   Q.   Not looking for your traffic tickets,
2 though.
3   A.   Okay.  That's why I paused.
4   Q.   Any actual cuffs-on arrests for anything?
5   A.   No, ma'am.
6   Q.   Okay.  All right.  Any significant medical
7 background?  Injuries, surgeries, anything that
8 impacts your duties or your --
9   A.   Nothing significant that impact my duties.
10   Q.   Any concussions or anything, damage to the
11 neurological functions?
12   A.   No, ma'am.
13   Q.   Are you taking any medications today?
14   A.   I take allergy medicine.
15   Q.   Because you live in Austin?
16   A.   Yes, ma'am.
17        Baby aspirin and a high blood pressure,
18 every day.
19   Q.   Also because you're working on Sixth Street
20 in Austin?
21   A.   Yes, ma'am.
22   Q.   None of that impacts your ability to recall
23 and visit with us today?
24   A.   No.
25   Q.   And on the day of the incident, probably

10

1 taking the same medications, also didn't impact you in
2 any way?
3   A.   I was probably just taking the allergy.  The
4 other two are newer.
5   Q.   All right.  Did you grow up in Austin?
6   A.   No, ma'am.
7   Q.   Where did you get your education?
8   A.   Well, I got some education here, but I
9 didn't grow up here.
10   Q.   Where did you start?
11   A.   I was born in Puerto Rico.
12   Q.   Okay.  How far did you go through school
13 there?
14   A.   12th grade -- I mean, 12 years old.
15   Q.   12 years old?
16   A.   I ended up graduating high school in College
17 Station.
18   Q.   A&M?
19   A.   Consolidated, yes.
20   Q.   Okay.
21   A.   I attended Texas A&M.  I finished my degree
22 at Southwest, or it was Texas State by the time I
23 finished.  I have a master's from Sam Houston.
24   Q.   And so you actually finished your high
25 school at College Station?

11

1   A.   Yes.
2   Q.   Oh.  They have a program -- a dual program
3 for college and high school, or just a -- it's a
4 separate?
5   A.   No, no, no.  It was just high school.  And
6 then I started college career.  Yes.
7   Q.   What was your degree in?
8   A.   Ultimately, from Texas State, was an applied
9 arts and sciences.
10   Q.   With any kind of focus in law enforcement
11 or...
12   A.   No.  I just wanted to finish at that time.
13   Q.   Any background in criminal justice?
14   A.   My master's is in criminal justice.
15   Q.   And the master's was Sam Houston you said?
16   A.   Yes, ma'am.
17   Q.   And so where was your -- did you -- did you
18 work during that time period as well, during your
19 education time period?
20   A.   Yes.
21   Q.   Where did you work during education?
22   A.   With APD.  You mean, assignment?
23   Q.   No, no.  I mean, when you were going to
24 college, were you also working as a --
25   A.   Oh, yes.  I haven't not worked since I was

12

1 14.
2   Q.   When you were in college, where did you
3 work?
4   A.   I was a pool manager for the Parks & Rec
5 department in College Station.  And I was a pharmacy
6 technician at St. -- what is the hospital --
7 St. Joseph's Hospital in Bryan.
8   Q.   So do you have certifications in
9 pharmaceuticals as well?
10   A.   I did.  But I don't have those anymore.
11   Q.   Not active, but you did get the
12 certification and learned about medications and...
13   A.   Well, at that time, the Texas Board of
14 Pharmacy was starting to get a certificate for
15 pharmacy technician.  So if I had stayed employed,
16 yes, I would have needed to get that certification.
17 But, you know, I moved on with my professional career
18 before that time came.
19   Q.   Gotcha.
20        What year did you graduate from high
21 school?
22   A.   '93.
23   Q.   And then you graduated from --
24   A.   See, you're going to get me now.
25   Q.   -- A&M -- I haven't asked your wedding date.

Manuel S. Jimenez - 12/19/2017

---

**13**

1  Those are the ones that get men.
2  **A.   The -- it took me --**
3         THE WITNESS:  You can write it down --
4  **A.   16 years to finish my bachelor's.**
5  Q.   (BY MS. SILVERMAN)  Nothing wrong with that.
6  Nothing wrong with that.
7  **A.   I see her face.**
8         **But only two for my master's.  I stayed**
9  **on track for that.**
10  Q.   That's okay.
11         So the 16 years was all at -- in --
12  **A.   Oh, no.  Gosh, no.**
13  Q.   Some --
14  **A.   Because once I -- we moved to Austin, I**
15  **mean, A&M was done.  They didn't have a distance**
16  **learning program at the time, so I just started going**
17  **to San Marcos, Southwest.  And then right before I**
18  **finished, they opened a spot up in Round Rock.  That**
19  **would have helped my drive to San Marcos, but I didn't**
20  **quite make it in time.**
21  Q.   So during that time period, after the
22  pharmaceutical tech job, where did you work?
23  **A.   Moved to Austin for the police academy,**
24  **or -- yeah, just moved to Austin to become a police**
25  **officer.**

---

**14**

1  Q.   Okay.  What year is that?
2  **A.   '99.  I didn't make -- I didn't pass the --**
3  **the interview portion at the time, so I worked at**
4  **Dell, just kind of waiting for the next class to**
5  **start.  Disqualified for a year.**
6  Q.   What did you do for Dell?
7  **A.   Sales.**
8  Q.   That works on your communication skills,
9  nothing wrong with that.
10  **A.   Yeah, I didn't -- it was not for me.  I**
11  **didn't care for the -- I don't know, it seemed kind of**
12  **deception, sleazy.  I didn't care for that.**
13  Q.   And so the next year came around and then
14  you were accepted into the --
15  **A.   Reapplied.**
16  Q.   Reapplied.  Accepted into the academy?
17  **A.   The way the cycle worked out, it was almost**
18  **two years.**
19  Q.   Gotcha.  And so what year is that, then,
20  when you're in --
21  **A.   '01.**
22  Q.   And then you go on to the academy while
23  you're also taking your college classes?
24  **A.   Oh, no, no, no.  I took a break.**
25  Q.   Gotcha.  So what year did you go to the

---

**15**

1  academy?
2  **A.   From '01, late '01, and I graduated May '02.**
3  Q.   And you started working then or you went
4  back to school?
5  **A.   No.  I went back to school later.  Yeah, I**
6  **just wanted to get my profession up and going before**
7  **going back.**
8  Q.   And so you started actually with APD since
9  you went to the academy with them?
10  **A.   Yes.**
11  Q.   And you've been with APD ever since?
12  **A.   Yes, ma'am.**
13  Q.   Without -- other than going back to school,
14  did you actually take a leave from APD to go back to
15  school, or you just did it at night?
16  **A.   Did it at night.**
17  Q.   Master's as well, did that at night as well?
18  **A.   Yes, ma'am.**
19  Q.   And then -- let's see.  And I know we've got
20  your training record, so I'm not going to go into the
21  details of that.  But since that time, you've had all
22  the updated trainings that are reflected in your
23  training records.  Right?
24  **A.   Yes, ma'am.**
25  Q.   Any informal training that would not be in

---

**16**

1  your record?  Anything else that's not reflected
2  there?
3  **A.   Not that I can think of, no.**
4  Q.   All right.  The day of the incident that's
5  subject of the lawsuit, let's go to that day.
6  Actually, no.  I'm sorry.
7         You've been with APD a long time.  What
8  were your -- what was your job title when you first
9  joined?
10  **A.   I believe it used to be called patrol**
11  **officer.**
12  Q.   Used to be called?
13  **A.   Because after two years, you were called a**
14  **senior patrol officer.  But that changed.  I think now**
15  **it's just everybody is called patrol officers.**
16  Q.   Okay.
17  **A.   There are no -- I could be wrong.  But it**
18  **used to be a different designation, someone less than**
19  **two years.  And a different badge.**
20  Q.   And you actually got to be patrol and then
21  got to be senior patrol?
22  **A.   Yes.**
23  Q.   How many -- so two years of regular patrol
24  you just said?
25  **A.   Uh-huh.**

---

**WRIGHT WATSON & ASSOCIATES**

Manuel S. Jimenez - 12/19/2017

17

1   Q.   And then how many years of senior patrol?
2   **A.   Probably four.**
3   Q.   And what units did you patrol?  Did you --
4   just Sixth Street unit or --
5   **A.   No.  That came later.  I was always assigned**
6   **to the Northwest Austin.**
7   Q.   Okay.
8   **A.   Just -- that's where I just did my time.**
9   Q.   And in -- what's your title now?  What are
10  you --
11  **A.   Sergeant.**
12  Q.   Sergeant.  And so are you still working in a
13  patrol division as a sergeant, or are you now --
14  **A.   No.  I'm over cadet training.**
15  Q.   At the academy?
16  **A.   Yes, ma'am.**
17  Q.   And so when did you get to take that
18  position?
19  **A.   This past July was two years.  So July of**
20  **'15.**
21  Q.   Soon after this?
22  **A.   Yes.**
23  Q.   And what are your duties as a cadet trainer?
24  **A.   I supervise 13 officers and a corporal, who**
25  **are the ones that teach all the classes to cadets.  I**

18

1   **facilitate kind of the time -- the cadet's time in the**
2   **academy, because I'm ultimately their supervisor, all**
3   **the cadets.**
4   Q.   Do you have any involvement with curriculum,
5   or is that a different department?
6   **A.   No, not in that regard, not in a teaching**
7   **realm.  It's more of a -- a supervisor, kind of get**
8   **everything situated and get everything completed.**
9   Q.   Where did -- where do you get the curriculum
10  for the academy, do you know?
11  **A.   From TCOLE, yes, ma'am.**
12  Q.   They provide the curriculum and you provide
13  the instructors and --
14  **A.   We have to follow lesson plans.  It's very**
15  **precise.**
16  Q.   Okay.
17  **A.   We can't deviate from lesson plans.**
18  Q.   Gotcha.  And in between there -- or what
19  year did you become a sergeant?  You were a sergeant
20  for a while before you became a trainer, I bet.
21  **A.   Well, it's easier for me to remember it from**
22  **the other way.**
23  Q.   Okay.
24  **A.   If that makes sense.**
25  Q.   That's fine.

19

1   **A.   I promoted to detective in '08.  December**
2   **'08.  I promoted into vehicular homicide.  So I was an**
3   **investigator, investigated traffic fatalities.  Then I**
4   **became a detective in the gang unit about two and a**
5   **half years later.  I left the gang unit after about**
6   **two years, and then I went downtown as a corporal on**
7   **night shift.  I did that for about a year and a half**
8   **almost.**
9   Q.   Downtown meaning at the --
10  **A.   Yes.  DTAC, yes, ma'am.  Walking beat.  And**
11  **then I promoted to sergeant, and I stayed downtown as**
12  **a sergeant on the other night shift.  Back then --**
13  **well, I guess there's still two night shifts.  So I**
14  **was the corporal on one night shift, and when I**
15  **promoted, I was placed on the sister night shift as**
16  **the sergeant.**
17  Q.   And what's the role of sergeant on the night
18  shifts down here?
19  **A.   Kind of the same thing as any other**
20  **supervisor.  You know, guide, mentor, do evaluations,**
21  **do paperwork, reporting, complaints, take complaints,**
22  **that sort of role.**
23  Q.   The sergeant reviews all the resistance of
24  force reports and --
25  **A.   Or a corporal.**

20

1   Q.   Or a corporal?
2   **A.   Depending on the level.**
3   Q.   Okay.  Depending on the level of?
4   **A.   Response to resistance.**
5   Q.   The amount of force you mean, or the -- what
6   do you mean by the amount of --
7   **A.   Well, they're categorized in the different**
8   **levels, depending on the response to resistance that**
9   **was used.  As an example, a Level 1, where there's a**
10  **firearm discharge on a subject, a supervisor would not**
11  **be reviewing that.  The SIU, internal affairs would be**
12  **reviewing those.**
13  Q.   Gotcha.
14  **A.   So you go from that to a -- where somebody**
15  **did a takedown, which would be a Level 3, a corporal**
16  **can review that.  A Level 2 would be as Taser**
17  **deployment, where neuromuscular incapacitation**
18  **occurred.  But if it did not occur, then it would be a**
19  **Level 3, so it just kind of depends on what...**
20  Q.   The Level 2 goes to a sergeant, Level 3 is
21  okay with the corporal?
22  **A.   Or the sergeant.**
23  Q.   Or the sergeant.
24  **A.   It's just a way to try to spread the**
25  **workload.**

Manuel S. Jimenez - 12/19/2017

21

1   Q.  Gotcha.
2          Then at the time this happened, you
3   were -- were you a night sergeant at that time, then?
4   A.  Yes, ma'am.
5   Q.  Okay.  And so as the night sergeant, did you
6   also do patrol, do beat patrol as well, or what?
7   A.  Not in that regard where I am expected to
8   answer 911 calls, because I need to be free to provide
9   assistance if I'm being requested from one of the
10  officers on the shift.
11  Q.  Okay.  Requested from the officer, not the
12  caller?
13  A.  Correct.
14  Q.  Okay.
15  A.  Obviously, as a -- as a way to help call
16  load the officer on my shift, the vast majority of
17  supervisors do -- will take smaller calls or --
18  implying that it's something quote/unquote easier to
19  handle.
20  Q.  So you can get back and be available?
21  A.  Correct.  Correct.  Alarm calls, that sort
22  of thing.  Certainly not a call where a report is
23  written.  You know, that's just not the role of the
24  supervisor.  We need to be available to field other
25  issues that come up.

22

1   Q.  And so at that time period, your day would
2   start and finish at the department, and generally you
3   would be staying there unless you went to go do one of
4   these calls?
5   A.  Well, a downtown supervisor works a little
6   bit different from my experience, because we just need
7   more help during bar closing.  So almost every night,
8   when we're dealing with the drunks and the behavior,
9   most people that are assigned to work, whether it's
10  evening or night, most -- even sergeants and
11  lieutenants are on Sixth Street, because we understand
12  things get out of hand rather quickly with large
13  crowds.
14  Q.  Well, and you have the pharmaceutical
15  background that probably helped you and served you
16  well at this point on the street.  Right?
17  A.  I wouldn't rely on something like that from
18  20 years ago.
19  Q.  All right.  So do you actually specifically
20  remember this day, or did you have to refresh your
21  memory from your report?
22  A.  Well, yes, I had to -- I mean, it's --
23  you're picking a day almost three years ago.  Yeah, I
24  would have to look back --
25  Q.  So you --

23

1   A.  -- and refresh my memory.
2   Q.  So you don't really remember what happened
3   that day right now as we speak, or did you -- once you
4   looked at your report, has it like come back into the
5   front of your mind or --
6   A.  It has for sure come back to the front of my
7   mind.
8   Q.  All right.  So how did that day start for
9   you?
10  A.  Oh, I'm not talking about the day.  I'm
11  talking about the incident.
12  Q.  So as far as like where -- where the day
13  started or that part --
14  A.  I -- I --
15  Q.  That's okay.
16  A.  -- after so many days in DTAC, yeah.
17  Q.  So what's the first memory you have?  Do you
18  get called out to the scene?  What's the first memory
19  you have from the incident?
20  A.  After reviewing the report?
21  Q.  Sure.  Whatever is in your memory.
22  A.  I remember someone that worked at an
23  establishment, Maggie Mae's, coming over to get our
24  assistance.
25  Q.  Did that person have to go all the way to

24

1   the station, or were you already out and about?
2   A.  No.  During the bar close time, 2:00 a.m.,
3   most -- most officers, most supervisors, sergeants,
4   corporals, lieutenants, are out on Sixth Street
5   because of the issues we have with drunken fights and
6   crowds and, you know, vehicles going down where
7   they're not supposed to, and at the same time, we have
8   to open up the street back to vehicles.
9          So the street is, at that time, closed
10  because it's a safer environment to have it closed to
11  vehicles.
12  Q.  Do you remember where you were when the
13  person from Maggie Mae's approached you?
14  A.  I do.
15  Q.  Where were you?
16  A.  At Sixth and Trinity.
17  Q.  And what did they say?
18  A.  We have a disturbance at Maggie Mae's.
19  Q.  And what was the person's name that reported
20  the disturbance?
21  A.  I do not recall.
22  Q.  Did you recognize the person as someone you
23  had seen in your work?
24  A.  Yes.
25  Q.  Can you --

Manuel S. Jimenez - 12/19/2017

25

1      A.  Most -- most bars have, you know, the same
2  people working the door, meaning, somebody working at
3  the door might not work behind a counter.  They work
4  the door.  And when it comes to that bar closing time,
5  it's countless and countless of disturbance calls that
6  are generated by the door person running to where the
7  officers are.  Every corner has officers on Sixth
8  Street at night, so they know where to go.
9      Q.  What did the person look like?
10     A.  White male, you know, wearing a Maggie Mae's
11 shirt, just...
12     Q.  Gray hair, blond hair, brown hair?  Do you
13 remember?
14     A.  I would say blond, dirty blond.
15     Q.  And it was the actual -- the door person
16 that came?
17     A.  Yes.
18     Q.  You recognized him as the door person?
19         That's a yes to the response?
20     A.  Yes.
21     Q.  I think I spoke over you.  That was my
22 fault.
23         All right.  And then what did that
24 person say, again?
25     A.  There was a disturbance.

26

1      Q.  That's it, they just said disturbance?
2      A.  (Nods head.)
3      Q.  Anything about bottles being thrown?  I read
4  that.
5      A.  We got that as we got closer.
6      Q.  So did you walk with the person to Maggie
7  Mae's?
8      A.  Behind them.  Oftentimes, when they come get
9  our attention, they're a lot more excited, so they
10 want to run back.  But our training down here, and
11 from experience, we usually not run with them because
12 we want to watch as we get closer to see what's going
13 on.
14     Q.  How far is it from where you were to Maggie
15 Mae's?
16     A.  Maggie's is two doors down, so not far at
17 all.
18     Q.  When they approached you, could you see
19 anything happening at Maggie Mae's at that point when
20 they first approached you?
21     A.  No.  You can't -- there's way too many
22 people.
23     Q.  As you approached, did you see a disturbance
24 or see anything happening outside Maggie Mae's?
25     A.  I saw a group of people having a -- what

27

1  looked like an argument or shouting with employees of
2  the establishment.
3      Q.  Including the one who just came to get you,
4  or...
5      A.  Well, he was going back, so he was not the
6  one yelling at them or, you know, arguing with them.
7  There was other people there at the door.
8      Q.  How many people in this group, about?
9      A.  The Maggie Mae's group?
10     Q.  No, no.  The group was that causing the
11 disturbance.
12     A.  You know, it's -- it's hard to tell because
13 of the size of the crowd.  I would guess ten, give or
14 take a couple, because if someone is just standing
15 there --
16     Q.  You don't know if they're with the group
17 or --
18     A.  Correct.  Engaged in whatever conversation
19 is happening.  I just -- I don't know if they're part
20 of it or not.
21     Q.  Did you recognize any of the other Maggie
22 Mae's employees by name or as people you knew or --
23     A.  Just people that worked downtown.
24     Q.  How many employees were out there?
25     A.  Two by the door, not counting the gentleman

28

1  that came and got us.
2      Q.  And then could you actually hear the
3  argument or what the people were yelling about or
4  complaining about as you approached?  Could you hear
5  what they were saying, or just noise?
6      A.  No, it's not something I could make out.
7      Q.  Could you hear what the Maggie Mae's
8  employees were saying?  Not the one that came to see
9  you, the other ones as you're walking up, do you...
10     A.  No, not that I could make out.  No.
11     Q.  And who -- what other officers are with you
12 as you walk over there?
13     A.  Paul Johnson.  And we're initially -- he was
14 the only one initially with me.
15     Q.  Just the two of you?
16     A.  Yes.
17     Q.  And while it's just the two of you, let's
18 start with that period, tell me what happens when you
19 get there.
20     A.  Well, as we're approaching, we're being told
21 that this -- this group of people were just removed
22 from the establishment, that they were closing,
23 everybody has to leave, and had started throwing
24 things, bottles, that sort of thing at -- or trash at
25 the establishment.

Manuel S. Jimenez - 12/19/2017

29

1    Q.  Did they show you -- did the employees of
2  Maggie Mae's show you any of the items that were
3  thrown or any of the other types of evidence of
4  that --
5    A.  No.
6    Q.  -- activity?
7          And did you see any of it as you were
8  walking that way?  See anybody throw anything?
9    A.  Not particularly.
10   Q.  What do you mean "not particularly"?
11   A.  Well, I mean, there's trash on Sixth Street.
12  Whether that came from that group, I just -- the
13  street is filthy.
14   Q.  Yes.  Did you -- but did you actually see
15  someone from that group throw something of any sort at
16  Maggie Mae's?
17   A.  No.
18   Q.  All right.  So you and Officer Johnson
19  approach.  What happens next?
20   A.  I began to tell Bolton that it was time to
21  leave.
22   Q.  So is he -- where is he at that point when
23  you get there?
24   A.  In front of the establishment, the street
25  area.

30

1    Q.  In the street?
2    A.  Yes, ma'am.
3    Q.  How far from the door of Maggie Mae's,
4  estimate?
5    A.  The curb is probably six feet from the door,
6  so a few feet after that.
7    Q.  About eight feet from the door?  About?
8    A.  Yes.
9    Q.  And is he standing with that -- the group
10  you're talking about?
11   A.  Kind of in the middle.
12   Q.  Why did you approach him in particular?
13  What was it that you saw?
14   A.  It was more of the -- the employees pointing
15  in that direction as we get close.
16   Q.  The same fellow that came to get you?  The
17  same employee?  I'm sorry.  The same Maggie Mae
18  employee that came to get you was pointing at someone?
19   A.  Correct.  And then all of the employees just
20  start pointing, That's them, that's them, you know.
21  But, yeah, at some point we have to make contact with
22  someone.
23   Q.  And what did you see -- well, when you saw
24  Grady Bolton, what was he doing?  Standing in the
25  street, I got that.  What else was he doing?

31

1    A.  Well, they were arguing back and forth with
2  the employees, kind of yelling back and forth.
3  Ultimately, we want to get the street open.  Right?
4    Q.  And what time does the street open back up?
5    A.  It depends on the crowd --
6    Q.  I'm never here for this time period, so I
7  don't know.
8    A.  Come on.  Back in the day.  Right?
9          It depends on the crowd.  So on an
10  extremely busy night, it could be an hour and a half
11  later.  On a night that's not so busy, it could be
12  15 minutes later, after 2:00.  So it just depends.
13   Q.  It's flexible.  You have the ability to open
14  the gate when you feel it's safe or it's secure?
15   A.  Correct.
16   Q.  All right.  And so it's about that time and
17  you see -- you see the crowd that you're directed to.
18  What is Grady doing, though, when you see him?
19   A.  Arguing.
20   Q.  Can you hear him at this point when you get
21  there, hear what the argument is about?
22   A.  No.  I'm not focused on that.
23   Q.  Where were his hands?
24   A.  I don't recall.
25   Q.  Is it hot outside or -- do people have coats

32

1  on, that you remember?
2    A.  Some do.  Some do.
3    Q.  Did Grady have a jacket?  Did Grady Bolton
4  have a jacket on or a coat on of any sort?
5    A.  I do not recall.
6    Q.  And do you recall if -- where his hands
7  were?
8    A.  No.
9    Q.  Did you see any weapons on him?
10   A.  No.
11   Q.  And then so what happens next?  You approach
12  him and you started to tell me earlier what happened.
13   A.  That we were called for a disturbance.  That
14  it was time to leave.  The street would be opening
15  soon.  And it's a nightly event to do that.
16   Q.  The disturbance and open?
17   A.  It's a nightly event to get people to leave.
18  Nightly event.
19   Q.  And so what did he say after you told him
20  that?
21   A.  That they didn't have to leave, something to
22  that effect.  It was then explained, yes, it's time to
23  leave.  We're opening the street.
24   Q.  Explain -- you explained that?
25   A.  Yes.

Manuel S. Jimenez - 12/19/2017

---

33

1    Q.  You said it like it was maybe somebody else,
2  but you explained that?
3    **A.  Correct.**
4    Q.  And then what happened next?
5    **A.  They -- the crowd becomes argumentative.**
6  **Bolton -- Grady.  Grady?**
7    Q.  Grady.  It's okay, either way.
8    **A.  Took a stance, like an aggressive stance.**
9    Q.  How do you -- how do you mean?  What does
10  that mean?
11   **A.  Just kind of bladed off.**
12   Q.  Bladed off, what does that mean?
13   **A.  That means kind of standing with one foot in**
14  **front of the other.  Like a defiance stance,**
15  **indicating, you know, they're not going to leave.**
16   Q.  And you're saying "they."  Did any -- any of
17  the other people -- was it all boys or girls too in
18  that group?
19   **A.  I couldn't say if females around were part**
20  **of the group.**
21   Q.  Did anyone else in that group say something
22  back to you as well?
23   **A.  Not that I recall.**
24   Q.  Anyone else take any other action towards
25  you in any way?

---

34

1    **A.  Not that I recall, no.**
2    Q.  So what happens next after he takes that
3  stance with one foot in front?
4    **A.  Well, the decision is made to take him into**
5  **custody.**
6    Q.  And who made that decision?
7    **A.  It's -- it's almost instinctual when --**
8    Q.  Was it you or was it Officer Johnson?
9    **A.  It's not something we speak about.  And the**
10  **dynamics of -- of trying to convey to someone who's**
11  **intoxicated the reasonings why we have to open the**
12  **street, the reasonings why it's not safe for them to**
13  **be on the street, and the inability for someone who's**
14  **drunk to comprehend that, ultimately they're not sound**
15  **judgment, sound mind.**
16        **So it's something that -- it's not a**
17  **decision that we say, okay, let's make the arrest.**
18  **But at some point we can't have an argument in the**
19  **street about whether or not they should be leaving or**
20  **not.**
21   Q.  Did you and Officer Johnson -- I know you
22  said it's not something you normally do, but did you
23  actually talk about whether to arrest him at that
24  point at all?
25   **A.  No.**

---

35

1    Q.  And is it just -- still just the two of you
2  at that point?
3    **A.  Yes.**
4    Q.  And so at some point the decision is made,
5  you're saying that's a joint decision between you and
6  Johnson essentially?
7    **A.  Yes.**
8    Q.  And what action do you take?
9    **A.  I was standing to -- kind of off-site to his**
10  **right, Bolton's right.  So I went -- I tried to grab**
11  **the -- the right arm, while at the same time,**
12  **Officer Johnson grabbing the left side of his body.**
13   Q.  And at that point, did -- what did you tell
14  him at that point?
15   **A.  That he was under arrest.**
16   Q.  And what did you tell him he was under
17  arrest for?
18   **A.  Public intoxication.**
19   Q.  And what were the -- what are the elements
20  of public intoxication would have to be proven before
21  you can arrest him for it?
22   **A.  Danger to himself or others, intoxicated in**
23  **a public place, city of Austin.**
24   Q.  And so what were the things that he did that
25  were a danger to himself?

---

36

1    **A.  His balance was unsure, his eyes were**
2  **glassy, strong odor -- strong odor of alcohol on his**
3  **breath, argumentative, unable to reason.  Things we**
4  **commonly see from drunk people downtown.**
5    Q.  And were there other things that also made
6  him a danger to others?  I asked them separately for
7  you there.  Were there separate actions he did that
8  were a danger to others?
9    **A.  Not that I observed.**
10   Q.  And then I think you also just gave me the
11  signs -- the signs you saw in him of intoxication,
12  which were the other elements were things you just
13  said, blur --
14   **A.  Glassy eyes.**
15   Q.  Glassy eyes.  I knew there was something
16  about eyes.  It slipped out of my mind already.
17  Glassy eyes and then city of Austin.  All right.
18        And so at that point, is it still just
19  you and Officer Johnson or --
20   **A.  Yes.**
21   Q.  -- by yourself?  Okay.
22        What happens next?
23   **A.  In the -- I attempted to do a leg sweep.**
24  **It's easier, safer oftentimes in a crowd to effect the**
25  **arrest while someone is on the ground.  So that was my**

---

Manuel S. Jimenez - 12/19/2017

37

1 thinking, do a leg sweep as a controlled movement to
2 take someone to the ground.
3    Q.  And what -- I think I skipped something.
4 What had Grady done -- you had one arm and Johnson had
5 the other -- you said side of his body.  What did
6 Grady do?
7    A.  Just tensed up.
8    Q.  Tensed?
9    A.  Uh-huh.
10    Q.  And so how did -- how did you engage the
11 action of the leg sweep?
12    A.  I don't think I was successful in the fact
13 that in the dynamic environment when you're making an
14 arrest with someone who's resisting, actively
15 resisting, I don't recall my leg actually making
16 contact with him.  I remember Grady just falling to
17 the ground.
18    Q.  How would it -- how would you normally
19 conduct the leg sweep?
20    A.  From -- from the side of the body I was at,
21 I would kick my -- my right leg up.  Just foot off the
22 ground, and basically -- excuse me -- almost make like
23 a hook with your foot, with your ankle, and pick up
24 the subject's right leg from under them.  At the same
25 time you're controlling their right arm, I'm on the

38

1 right side of the body, and you're getting them off
2 balance, so as they go to the ground you have control
3 of one arm and you can effect the arrest.
4    Q.  And did you talk to Officer Johnson at all
5 about that leg sweep?  Did you say, I'm going to do a
6 leg sweep?  Does that happen?
7    A.  No.  It's a --
8    Q.  But he could tell you -- he could tell from
9 your movements what you were trying to do probably?
10    A.  No.  In that split second, the actions of
11 an arrest like this, where someone is actively
12 resisting, no.  There's -- there is no time to have a
13 conversation about what you might do or I might do.
14    Q.  But could he tell -- could he see what you
15 did?  Would he be able to see that?
16    A.  Not in that split second.  It's a very fluid
17 action.  It's done, you know, in a very small amount
18 of time.
19    Q.  And what -- and so you said that Grady had
20 tensed up.  What were the other actions he did that
21 were resisting at that point?
22    A.  Just tensing up.
23    Q.  And it's still just you and Officer Johnson?
24    A.  Yes.
25    Q.  And after you do the leg sweep, I believe

39

1 you said he was on the ground, but you don't think you
2 made contact?
3    A.  I'm almost certain I did not make contact.
4 And soon after, another officer arrived in that time
5 frame.
6    Q.  And so when he was on the ground, did you
7 find yourself still holding onto his right arm as you
8 had -- part of what you had planned there?
9    A.  Yes.
10    Q.  And what had you -- what had Officer Johnson
11 done while you attempted the leg sweep?
12    A.  To get the subject on the ground?
13    Q.  Or what had he done just, period?  Did he
14 stand there or did he help in some way?
15    A.  Well, later, I found out he was doing a
16 brachial stun, and ultimately that's what got Bolton
17 to the ground.
18    Q.  So you didn't get to see the brachial stun?
19    A.  No.
20    Q.  What is a brachial stun?
21    A.  It's a technique used to affect the brachial
22 nerve.
23    Q.  What's the brachial nerve?
24    A.  It's a -- it's a nerve in the neck area.  It
25 has a jarring effect on -- it's kind of a jolt when

40

1 you strike it.  Usually, it makes people limp and kind
2 of makes it easier for the arrest to continue.
3    Q.  And so now he's on the ground.  And did you
4 say that it's at that point, once he's on the ground,
5 that another officer arrives?
6    A.  Somewhere in that time frame.
7    Q.  And that officer is who?
8    A.  Michael Nguyen.
9    Q.  And did he arrive by himself or with
10 somebody else?
11    A.  By himself.
12    Q.  And do you know now if Grady was already on
13 the ground when he arrived, or if he saw the brachial
14 stun?
15    A.  I can't say if he saw somebody else's
16 action, yes.
17    Q.  And so what happens now?  He's on the
18 ground, and it's you, Officer Johnson, and
19 Officer Nguyen.  What happens now?
20    A.  I'm holding his arm, right arm behind his
21 back.
22    Q.  I'm sorry.  Is he on his face at this point,
23 or is he on his back when he fell?
24    A.  I don't remember if he fell on his back, on
25 his face.  We -- when the -- when the -- when he went

Manuel S. Jimenez - 12/19/2017

41

1 down, we all just found ourselves down also, because I
2 already had control of one arm.  So I don't recall if
3 he fell on his back and we turned him over, or as he
4 went down, it was almost like a -- like we rotated on
5 the way down.
6    Q.   And you maintained control over his right
7 arm that whole time?
8    A.   Yes.
9    Q.   And were -- where on the arm were you
10 holding it?
11    A.   Wrist, biceps area.
12    Q.   Did you have both your hands on the one?
13    A.   Yes.
14    Q.   So one hand is on the wrist and one is on
15 the biceps area?
16    A.   Correct.  Somewhere higher up on the arm.
17    Q.   And then what do you do next?
18    A.   I don't recall if it was my handcuffs or
19 Officer Johnson's handcuffs, but a pair went on the
20 right arm.
21    Q.   And you put them on the right arm?
22    A.   I don't recall if it was my set or his or if
23 I did or Officer Johnson.
24    Q.   And then what happened next?
25    A.   We --

42

1    Q.   At this point, I should say, did Grady do
2 anything else at this point?
3    A.   Well, he is not providing us his other arm.
4    Q.   Did he do anything else, though?
5    A.   Other than resisting?
6    Q.   How -- what did he do to resist?
7    A.   He's keeping control of his left arm.
8    Q.   How is he keeping control?  What do you mean
9 by keeping control of his left arm?
10    A.   Well, he's laying on it and he's refusing
11 to -- for us to --
12    Q.   He's laying on it.  So he's definitely on
13 his stomach at this point?
14    A.   Yes.  At that point he's on his stomach.
15 Correct.  And he's -- I don't know if it's up here or
16 down here, meaning up by the face, because I'm focused
17 on --
18    Q.   The right arm?
19    A.   On the right arm and on the crowd.
20    Q.   But you do know the left arm is under him in
21 some position?
22    A.   In some fashion.
23    Q.   And then -- and you've got the right arm and
24 you've got it in a cuff somehow?
25    A.   Yes.

43

1    Q.   Either you put it in the cuff or Johnson put
2 it in the cuff.  Behind his back?
3    A.   Correct.
4    Q.   And then did he yell anything at you at this
5 point or say anything to you?  Grady?  Did Grady?
6    A.   Not that I recall.  It's loud and lots of
7 people around.
8    Q.   Did you say anything else during that --
9 after telling him that you're under arrest for public
10 intoxication, did you say anything else to him?
11    A.   Stop resisting.  Yes.
12    Q.   And then what -- at this point, it is
13 Officer Nguyen, Officer Johnson, and you still.
14 Right?
15    A.   Yes.
16    Q.   What happens next?
17    A.   Well, ultimately, the arm comes out, the one
18 that was under him.
19    Q.   The left arm?
20    A.   The left arm.
21    Q.   Do you know how?
22    A.   I do not.
23    Q.   Did you see what Officer Johnson was doing
24 right at that time period?
25    A.   Not necessarily.

44

1    Q.   What do you mean "not necessarily"?  What
2 did you see?
3    A.   Well, I'm focused on what I'm doing and
4 the -- again, to repeat it, the dynamics of an arrest,
5 I have to focus on my actions.  And in this situation,
6 downtown, every time we deal with making an arrest in
7 a crowd, we have to be extremely mindful of the crowd
8 as well.
9    Q.   What did you see in the crowd, if anything,
10 so I understand?
11    A.   Just people yelling, you know, not aware of
12 what's going on, you know, yelling support for the
13 person being arrested.
14    Q.   Did you see them doing anything, though, or
15 you just heard that?
16    A.   Just kept -- my attention kept getting
17 diverted.
18    Q.   What did you see of what Officer Johnson did
19 at that point?
20    A.   Very little.
21    Q.   What did you see?  What is the very little?
22 What did you see?
23    A.   I know he moved to the top of the -- his
24 body.
25    Q.   Top of Grady's body?

Manuel S. Jimenez - 12/19/2017

---

45

1    A.  Correct.
2    Q.  Not Officer Johnson's body.
3    A.  Yeah.  Top of Grady's body.  And he was
4  assisting Officer Nguyen retrieve that other arm.
5    Q.  So you're -- where were you standing holding
6  the right arm?
7    A.  I was on Bolton's left side.
8    Q.  So reaching across the body?
9    A.  Well, his arm is already on his back.
10    Q.  Right.  Arm is back here.  So you're on the
11  left-hand side, still holding the right --
12    A.  Oh, yes.
13    Q.  -- arm, because it has a handcuff on it.
14  And Officer Johnson has moved to the top, meaning the
15  head area?
16    A.  Correct.
17    Q.  And where is Officer Nguyen standing?
18    A.  Well, we're kneeling.
19    Q.  Kneeling, yes.
20    A.  He's to my left, also toward the arm.
21    Q.  On the left-hand side of the body as well?
22    A.  Correct.
23    Q.  And up closer to the head from you or on the
24  other side?
25    A.  Officer Nguyen?

---

46

1    Q.  Officer Nguyen.
2    A.  Closer -- he's trying to get the arm out.
3    Q.  Which would put him closer to the head?
4    A.  Correct.
5    Q.  And what is he doing to try to get the arm
6  out?
7    A.  Well, I saw a video last week for the first
8  time.  So do you want me to tell you what I saw in the
9  video?
10    Q.  Sure.
11    A.  Because the arm ended up with me, and --
12    Q.  In the cuff.
13    A.  That night it was handcuffed.  But in the
14  video that I saw last week, yeah, it's -- you see
15  Officer Nguyen pulling several times trying to get
16  that arm out.
17    Q.  Did you see Officer Nguyen -- he says he did
18  a knee something -- knee something on Grady Bolton.
19  Did you see that?
20    A.  No.
21    Q.  You saw him with the arm.  And did he hand
22  the arm to you then to put the cuff on?
23    A.  I can't -- I can't say.
24    Q.  You can't see that in your mind?
25    A.  No.

---

47

1    Q.  And you can't see that on the video?  You
2  can't see if he handed --
3    A.  I don't recall seeing that.  But it ended
4  up -- somehow it ended up where the other arm is with
5  the handcuff.
6    Q.  And you put the cuff on, you think, once the
7  arm was...
8    A.  Sure.
9    Q.  Well, no, you don't recall.  It's okay.  If
10  you don't recall, just tell me.
11    A.  No, I don't.
12    Q.  You don't recall.
13        And then did you see anything else that
14  Officer Nguyen did during that time period, during the
15  arrest?
16    A.  No.
17    Q.  And then Officer Johnson, did you see
18  anything else he was doing at the upper part of the
19  body or head area?
20    A.  Not from memory, no.  Again, I saw the
21  video --
22    Q.  Right.
23    A.  -- last week.
24    Q.  What did you see on the video?
25    A.  Reading -- after reading his report,

---

48

1  obviously, it -- he was trying to effect more brachial
2  stuns.
3    Q.  And so reading the report -- I don't know if
4  I want to jump to that.  We'll finish where we are and
5  we'll come back to that.
6        So what happens next?  You've got him
7  in handcuffs.  It's still just Officer Johnson and
8  Officer Nguyen and you?
9    A.  Yes.
10    Q.  When does Officer Ramirez get there?
11    A.  Soon after.  It's hard to say.
12    Q.  And I guess I don't mean timeframe-wise.
13  Was Grady Bolton still on the ground in the handcuffs
14  when Officer Ramirez arrives?
15    A.  Was he still handcuffed?  Yes.  Was he on
16  the ground?  Possibly.
17    Q.  Did Officer Ramirez help in the arrest part
18  in any way?
19    A.  Not that I recall.
20    Q.  Did he arrive when the arrest was still
21  going on in any way?
22    A.  Not that I recall.
23    Q.  What happens now?  Grady is on the ground in
24  handcuffs.  What happens now?
25    A.  The decision is made to move Grady to the

---

Manuel S. Jimenez - 12/19/2017

49

1 block over on Trinity to get away from the crowd.  In
2 these situations, especially when people are with --
3 surrounded by other intoxicated people, people that
4 you can't reason with at the time, people that are
5 yelling profanities at the -- at the officers on
6 scene --
7     Q.  Did you hear any profanities yelled that
8 night?
9     A.  No.  But I know it happens.  But it's --
10 it's standard to move the person somewhere else to do
11 paperwork and that sort of thing.  It's not
12 appropriate to do it there.
13     Q.  And so where did you move him?
14     A.  To Trinity.
15     Q.  Trinity Street?
16     A.  Yes, ma'am.  Where we usually kind of
17 station.
18     Q.  And how did you move him?
19     A.  Well, we assisted him up.  Oftentimes people
20 that are belligerent, intoxicated, I'm not sure if
21 it's a way to be defiant or a way to -- regardless,
22 people refuse to use their feet.  And oftentimes they
23 make officers carry them because they don't want to be
24 arrested.
25     Q.  And so what did --

50

1     A.  So he was carried.
2     Q.  By who?
3     A.  Myself, Officer Johnson, Officer Nguyen, and
4 I believe Ramirez -- Detective Ramirez had gotten
5 there.  And I don't know who had what limb, but it's
6 just easier just to carry somebody away.
7     Q.  And at this point -- I know you said that
8 sometimes people are yelling profanities -- is Grady
9 yelling any profanities to you?
10     A.  No.
11     Q.  And I don't doubt people do that on Sixth
12 Street all the time.  But is he being -- saying
13 anything belligerent to you at this point, anything
14 like that, any more defiance?
15     A.  No.
16     Q.  Did he say anything at all?  Why are you
17 arresting me or anything like that, after he was on
18 the ground?
19     A.  Not at the time.
20     Q.  Had he said anything like that before --
21 before he was taken to the ground?  Did he say
22 anything like, why am I being arrested, or anything
23 like that?
24     A.  No.  I don't recall him saying -- asking
25 why.

51

1     Q.  So you get him to Trinity Street.  All
2 right.  What happens there at Trinity Street?
3     A.  We wait for a transport, someone to come
4 pick him up.
5     Q.  So is the street still closed at this point?
6     A.  Yes, ma'am.
7     Q.  And is it closed past Trinity?  Is it
8 closed -- Sixth Street is the street that's closed.
9 Right?
10     A.  Correct.
11     Q.  And is it closed -- it's closed all the way
12 to I-35?
13     A.  No.  I think that night it's probably to
14 Brazos.
15     Q.  So when you say waiting for transport, is
16 this a car you're waiting for or a bike transport?
17 What kind of --
18     A.  Somebody to transport him to the jail.
19     Q.  A car transport?
20     A.  Yes, a vehicle transport.
21     Q.  I didn't know if you had like bike
22 transports for people --
23     A.  No.
24     Q.  Okay.  A vehicle.
25         Do you know who came to get him?

52

1     A.  I do not.  It should be in the report.
2     Q.  Okay.  And did you go -- did you ride with
3 him then?
4     A.  No.
5     Q.  No?
6         He goes to the police station.  And
7 then at this point you stay on Sixth Street?
8     A.  Yes.
9     Q.  So did you have anything else to do directly
10 with him that night?
11     A.  No.
12     Q.  Okay.  Did you see him again that night at
13 all?
14     A.  No.
15     Q.  The next thing you do in relation to the
16 case is you write your report.  Right?
17     A.  Correct.
18     Q.  Okay.  So when does that happen?  When do
19 you write your report?
20     A.  I can look to see when it was written.  I
21 could assume that it was the night of, but there are
22 times where other things occur and you just don't have
23 the time for it.
24     Q.  I'm going to show you, just to help refresh
25 your memory and see if I'm understanding this right,

Manuel S. Jimenez - 12/19/2017

---

53

1  COA page 29 from the discovery. Is this the note that
2  says when the report gets filed? Am I understanding
3  that correctly, that that shows when?
4  **A. Possibly. Possibly. Can I --**
5  Q. Of course. Yes. It looked like it went
6  reverse.
7  **A. Correct. Sometimes when -- as the**
8  **supervisor, when I review the report, it tags when I**
9  **go in and review the report.**
10  Q. Oh, so that could be you reviewing --
11  **A. It could be a timestamp. Correct.**
12  Q. The first you would do is you would actually
13  review -- whose report? Johnson's report, or --
14  **A. Well, I would review my officers' reports.**
15  Q. All of them?
16  **A. Correct.**
17  Q. All right.
18  **A. Aside from my own report. So -- so, this is**
19  **my report. I would have to find out the answer,**
20  **whether or not that's the timestamp of when the report**
21  **was written.**
22  Q. So it could be -- it could be you went
23  back in and that's -- or it could be that's when
24  you're looking at --
25  **A. At 7:00 in the morning the same day, more**

---

54

1  **than likely that's when it was written. But, again,**
2  **it could be a timestamp of when I looked at it.**
3  Q. And then this probably answers my other
4  question, then. I saw someplace where it had you
5  going back in on another day. And would that be you
6  reviewing other reports?
7  **A. Correct. Like here, here's another**
8  **timestamp.**
9  Q. Yes.
10  **A. Uh-huh.**
11  Q. So it says, modified document. Would you
12  have actually modified the document, or is that
13  something else?
14  **A. I don't know if that's a designation that**
15  **central records puts in when I go in.**
16  Q. That's not something you checked. You
17  didn't check off modify document?
18  **A. No. No. Like here, there's another**
19  **sergeant. You know, every time he adds or he checks,**
20  **it stamps it.**
21  Q. So Sergeant Dear is also in a supervisory
22  capacity that night in the same location downtown?
23  **A. He was an evening shift sergeant.**
24  Q. Is that separate from you?
25  **A. I'm night.**

---

55

1  Q. Okay.
2  **A. He would get off around 3:00 in the morning.**
3  **I would get off around 8:00.**
4  Q. Okay. So he should have been gone already,
5  then?
6  **A. Around 3:00 in the morning? No.**
7  Q. This would have been his last event for the
8  day?
9  **A. Well, I don't know.**
10  Q. Okay. So -- but that's what that is, then.
11  That's Dear going in and looking at everybody's --
12  **A. Or making any notes. Because he -- since I**
13  **was part of the response to resistance, I'm not**
14  **allowed to review or say it was good or not good or**
15  **justified under the policy. I would have to call, by**
16  **policy, another supervisor to review my actions and**
17  **the other officers' actions.**
18  Q. So had you already called him to this scene
19  at that night?
20  **A. Yes. When we were on Trinity waiting for**
21  **transport.**
22  Q. When did he get there? Or in relation to
23  when he arrived, what's going on? Officer Dear that
24  is.
25  **A. Sergeant Dear got there before Bolton was**

---

56

1  transported. They spoke.
2  Q. Before he was transported from?
3  **A. From Trinity.**
4  Q. From Trinity. So he -- when Sergeant Dear
5  arrives, he's already at Trinity?
6  **A. Correct.**
7  Q. Okay. And Sergeant Dear was never at the
8  scene where you actually arrested him a few blocks
9  over?
10  **A. No.**
11  Q. Never.
12      So the only officers that were there
13  during the arrest are you and Nguyen and Johnson?
14  **A. Yes.**
15  Q. Ramirez arrives and helps carry?
16  **A. Yes.**
17  Q. And then Sergeant Dear arrives at Trinity?
18  **A. For the reporting.**
19  Q. For the reporting. And all he does in
20  the -- in a reporting capacity is review your reports?
21  **A. Well, on scene, he has to speak to the**
22  **parties involved, just briefly, you know.**
23  Q. Okay.
24  **A. Ask -- me, as the supervisor, I would go to**
25  **the scene and ask the person being arrested, you know,**

---

Manuel S. Jimenez - 12/19/2017

---

57

1  kind of the details of what occurred.  I would ask
2  other officers what occurred.  And me, as the
3  supervisor, if I deem something is inappropriate, I
4  can escalate -- we are bound to escalate the incident
5  to a higher level.  Maybe get -- if it's criminal in
6  nature, get SIU involved, that sort of thing.
7      Q.  Was there anything that you saw when this
8  was happening that caused you to feel it needed to be
9  escalated?
10     A.  No.
11     Q.  And anything you saw in the video
12  afterwards -- obviously, years afterwards that caused
13  you to feel --
14     A.  Absolutely not.
15     Q.  -- it needed to be escalated?
16         And sergeant -- the video that we had,
17  do you know where that came from?  Has anybody told
18  you?
19     A.  Well, I heard last week during the depo.
20     Q.  Okay.  And before that, as far as you know,
21  none of you had seen that video?  That video had never
22  been turned in by a claimant or anybody else?
23     A.  I have never seen that video.  I didn't know
24  it existed until last week.
25     Q.  And as far as you know, Sergeant Dear didn't

---

58

1  know it existed either?
2      A.  I would not know that.
3      Q.  Did you all have any -- well, actually,
4  communication there on the scene, how do y'all
5  communicate on Sixth Street?  Do you use cell phones,
6  radios?  Are there MDTs in your hands?
7      A.  Just radios.
8      Q.  Radios?  Never use cell phones?
9      A.  To communicate with other officers?
10     Q.  Right.
11     A.  No.
12     Q.  Did you radio back any of this to dispatch,
13  or did it happen too quickly?
14     A.  Which portion?
15     Q.  Any of the arrest.  I mean, once he's on
16  Trinity, that's different.  But I mean, during the
17  arrest, were you radioing anybody?
18     A.  I was not.  But I don't know if other people
19  used the radio or not.
20     Q.  And if they did, that would be to -- that
21  would be recorded in what?  What kind of document?
22     A.  The CAD call.
23     Q.  CAD call?
24     A.  If it was -- if it was transmitted.
25     Q.  Gotcha.

---

59

1      A.  Right?
2      Q.  So there's a difference?  You can talk
3  without transmitting?
4      A.  Well, you go through the motions, but
5  because there's so much radio traffic down there, you
6  oftentimes think that you're getting out -- we call
7  that getting out, meaning they can hear me, when, in
8  fact, you're not getting out.
9      Q.  Oh, you mean, dispatch can't even hear you?
10     A.  Correct.
11     Q.  And you're talking -- you could be saying --
12     A.  Because you think you have the mic.  But at
13  the same time you key up, somebody else could key up.
14  And if they beat you by a fraction of a second, their
15  mic becomes live and not yours.
16     Q.  So how many mics are on one circuit like
17  that?
18         MS. EDWARDS:  Objection.  Relevance.
19     Q.  (BY MS. SILVERMAN)  You can still answer.
20  Don't know?
21     A.  No.
22     Q.  But you could be -- your whole team is on
23  the same one?  Like I say team...
24     A.  The whole sector.
25     Q.  The whole sector is on the same one?

---

60

1      A.  That coupled with the noise.
2      Q.  So you could be saying, officer down, and if
3  you were not the first one...
4      A.  That is correct.
5      Q.  All right.  Then did you ever have any time
6  where you group back and talk about the arrest at the
7  end of the day or -- or did y'all talk about this
8  arrest at the end of the day at all?
9      A.  Not that I recall.
10     Q.  Before writing your report, did you and
11  Johnson talk to each other at all?
12     A.  No.
13     Q.  Did you know Officer Johnson well?
14     A.  I did.
15     Q.  Did -- what do you understand the cause of
16  death to be for him?
17         MS. EDWARDS:  Objection.  Relevance.
18     Q.  (BY MS. SILVERMAN)  You can still answer.
19     A.  The manner of his death?
20     Q.  Yes.
21     A.  It was an accident.
22     Q.  Skydiving or hang gliding?
23         MS. EDWARDS:  Objection.  Relevance.
24     A.  Neither.
25     Q.  (BY MS. SILVERMAN)  What kind of accident?

---

Manuel S. Jimenez - 12/19/2017

61

1    A.   It was some -- I think it's called a
2   paraglider.
3    Q.   Paraglider.
4        And had you -- did you work side by
5   side with him frequently?
6    A.   He was one of my officers.
7    Q.   One of your officers.  How long had he been
8   one of your officers?
9    A.   About two years.
10   Q.   Had you had any difficulties with him?
11   A.   No.
12   Q.   Had he made any arrests that you found
13  questionable?
14   A.   No.
15   Q.   Had he ever been -- had you ever seen him
16  assaulting anybody?
17   A.   Assaulting anyone?
18   Q.   Right.
19   A.   No.  That would be a violation if I didn't
20  report it.
21   Q.   Right.  That's -- and had you ever seen any
22  behavior in him that caused you any concern
23  whatsoever?
24   A.   No.
25   Q.   Do you know if he was taking any medications

62

1   or anything that could have affected his understanding
2   of what was going on?
3    A.   I would not know that.
4    Q.   Don't know.  Okay.
5        I'm going to show you what is COA
6   page 6.  And it talks about the resistance.  Do you
7   know what Expired Code means?
8    A.   Expired Code?
9    Q.   Yeah.  What does -- is that -- do you know
10  what that means?
11   A.   I do not.
12   Q.   And then do you know what Empty -- can you
13  tell me a definition for Empty Hand Defensive
14  Resistance?
15   A.   Where a subject does not have a weapon.
16   Q.   That's all that means?
17   A.   Well, it's an empty hand.
18   Q.   Gotcha.  All right.
19        You mean told me that.
20        I'm going to show you COA 34.  What
21  type of document is that?  It looks like a chip of
22  some sort or a small piece of paper?
23   A.   I would imagine it's from the jail because
24  it says, inmate used phone.
25   Q.   Yeah.

63

1    A.   And a time.  The date and time.
2    Q.   So that's not something that APD generated,
3   that's something Travis County generated?  You don't
4   recognize that?
5    A.   I do not recognize that.  I would assume
6   it's from the county because of the time.
7    Q.   Oh, okay.
8    A.   It was well into --
9    Q.   Well out of your custody at that point?
10   A.   Right.
11   Q.   Do you -- you don't have any idea what time
12  you turned him over to transport?
13   A.   I do not.
14   Q.   What document might reflect that?  Any idea?
15  If it's not in here?  So that would -- the booking
16  sheet would normally be the one that showed the time
17  he was checked in?
18   A.   Not necessarily, but I'm wondering what the
19  2:59 is.
20   Q.   Yeah.  I was wondering that too.
21   A.   It's -- TCSO wrote that.
22   Q.   And so that 2:59 -- when you say TCSO, you
23  mean Travis County Sheriff's Office wrote 2:59?
24   A.   Travis County Sheriff's Office.
25   Q.   And then that has another time,

64

1   8:00-something, 8:09.  But you don't -- you had
2   nothing to do with that.  Right?
3    A.   Huh-uh.
4    Q.   Would you think, based on when you started
5   this process, that 2:59 would be closer to when he
6   should have been in Travis County custody?
7    A.   I would imagine.
8    Q.   Than 8:09?
9    A.   Yeah.
10   Q.   But normally, that's -- I was looking in the
11  right place, normally that would be where you would
12  find when he arrived in their custody?
13   A.   Correct.
14   Q.   Okay.  And we are looking at the top of
15  COA 35.
16        Does this one have time of arrest on it
17  somewhere?  That would be -- and that is COA 37.
18   A.   No, I don't see it.  No.  That's when we
19  were flagged down.
20   Q.   Yeah, it looked like the start time was
21  there.
22   A.   Correct.
23   Q.   And that's -- Officer Johnson signed that
24  form.  Is that right?
25   A.   His affidavit?

Manuel S. Jimenez - 12/19/2017

65

1   Q.   Yes, he signed the affidavit?
2   A.   Yes, ma'am.
3   Q.   So you weren't at Travis County when he
4   arrived and don't know what Travis County personnel
5   visited with him at all.  Right?  Or who -- who might
6   have visited with him?
7   A.   (Shaking head.)
8   Q.   You're shaking your head no.
9   A.   No, I'm sorry.
10         THE WITNESS:  Can you type, shaking
11  head?
12  Q.   (BY MS. SILVERMAN)  I'm sure he was typing
13  shaking head.
14         In your training, what have you been
15  trained is the goal for use of force?  Goals or
16  reasons for use of force?
17  A.   The reasoning for using?
18  Q.   Yeah, for using.  For police officers using
19  force.
20  A.   In response to resistance?  To effect an
21  arrest.
22  Q.   Any other times you would need to use force?
23  A.   You would use force to prevent someone from
24  hurting themselves, hurting others.
25  Q.   All right.  Going to that first one, the

66

1   response to resistance, what have you been trained
2   about the type and amount of force that is necessary
3   for that?  What's the training?
4   A.   The least amount to get the -- get the end
5   result.
6   Q.   And are you familiar with or trained on the
7   continuum of force?  Or what are you trained on at the
8   academy that you're now supervising?
9   A.   Yes.  It's a model of responding.  Your
10  response is generated based on the behavior that you
11  receive.
12  Q.   And so you started telling me this earlier,
13  and not an answer to the question, now we're back to
14  it, the teaching part.  There's 1, 2, 3, what were the
15  levels of resistance that you started telling me
16  about?  1, 2, 3?
17  A.   1, 2, 3.
18  Q.   And what is -- what qualifies as Level 1?
19  A.   Shootings, obviously.
20  Q.   So that's at the top?
21  A.   Correct.  Where -- like a Taser discharge.
22  Q.   That's a 1, too?
23  A.   No, no.  If the Taser discharged, it hits
24  the head.  A PR-24, the baton, a strike to the head,
25  those would be examples of 1s.

67

1   Q.   All right.  And what behavior is required of
2   the subject to -- for a Level 1 force to be
3   reasonable?
4   A.   Well, it would have to be a serious
5   violation.  It could be active aggression, with or
6   without a firearm or weapon, a weapon.
7   Q.   Just using a firearm --
8   A.   Well, it's the behavior, whether or not they
9   have a weapon or not.
10  Q.   Gotcha.
11         And then -- so then the next level down
12  is 2.  What's that type of force?
13  A.   A Taser deployment is the most common 2, where
14  neuromuscular incapacitation occurs, meaning the Taser
15  has an effective discharge.
16  Q.   And what behavior of the subject is
17  necessary for that to be a reasonable...
18  A.   Defensive resistance, empty hand defensive
19  resistance could garner a Taser deployment.
20  Q.   Any others?
21  A.   Active resistance also.
22  Q.   What's active resistance?
23  A.   Well, I guess that's the same thing.  No.
24  We'll go with that.
25  Q.   All right.  And then Level 3, what's a

68

1   Level 3 force?
2   A.   Pressure points, takedowns, OC.
3   Q.   What's OC?
4   A.   Pepper spray.
5   Q.   Okay.
6   A.   A Taser deployment where you don't get the
7   incapacitation, that's a 3.
8   Q.   And what behavior on the part of the subject
9   is necessary for that Level 3 force to be reasonable?
10  A.   I think it's called -- I believe it's called
11  passive resistance.
12  Q.   And what's the definition of passive
13  resistance?
14  A.   It's when they're not -- they're resisting
15  your -- they're resisting your force, but they're not
16  actively using aggression against you.
17  Q.   What are some examples of that?
18  A.   Resisting an arrest without striking an
19  officer.
20  Q.   Like what's resisting an arrest without
21  striking?
22  A.   Well, not wanting to be arrested is
23  resisting an arrest without striking.  Now, if a
24  person is resisting an arrest and striking an officer,
25  that's a different level of force.

Manuel S. Jimenez - 12/19/2017

69

1  Q.  What level of force is that?
2  **A.  Well, it would be higher because we're**
3  **responding to their strikes now.  It would be a 2.  If**
4  **the officer uses that force.**
5  Q.  Gotcha.  What other behavior of the subject
6  is necessary or can -- to be reasonable for a Level 3?
7  **A.  I'm not sure I follow.**
8  Q.  Oh.  What other behavior of the subject, the
9  potential arrestee, could -- would it be reasonable
10  for you to use a Level 3?  Just the passive arrest
11  that you said?
12  **A.  Yes.**
13  Q.  That's it?  That was a yes.  Right?
14  **A.  Yes.**
15  Q.  She was taking down the nodding head.  The
16  only problem with that is, when you write "nodding
17  head," we don't know if it's nodding or shaking.  It
18  gets confusing.
19  **A.  That's a good point.**
20  Q.  Any other factors or guidelines in the use
21  of force that you consider when you're out there on
22  Sixth Street that you haven't told us yet?
23  **A.  Not that I can think of.**
24  Q.  You actually already said this earlier, but
25  just to make it in line here.  What's APD's policy on

70

1  what you're supposed to do if you see another officer
2  wrongfully arresting someone?
3  **A.  Stop them from making a wrongful arrest and**
4  **report it.**
5  Q.  Report it to someone above you?
6  **A.  Yes.**
7  Q.  And what would APD's policy be if you see an
8  officer using excessive force?
9  **A.  Definitely report it.  The same.**
10  Q.  And stop the behavior?
11  **A.  Correct.**
12  Q.  How would you stop the behavior?
13  **A.  By stopping it.**
14  Q.  Physically?
15  **A.  If that's what it takes.**
16  Q.  Anything that it takes to stop wrongful
17  behavior, you should do it?
18  **A.  Of course.**
19  Q.  And there's no -- you don't get, as part of
20  your radio, any type of MDT function where you can
21  type like you do in a car?  The radio is just that,
22  the radio we talked about that's hooked up to
23  everybody else?
24  **A.  Correct.  I caught myself.**
25  Q.  She's going to be so happy with you.

71

1  Are there any, like, daily arrest logs
2  or weekly arrest logs that would have information on
3  them about this arrest?  Like in addition to your
4  report, is there another daily log you fill in or a
5  weekly log, a monthly log of arrests?
6  **A.  I'm not sure I understand, but, no, there**
7  **isn't something else I fill out documenting --**
8  Q.  No other forms?  All you have do is the one
9  report we see, it goes into the computer?
10  **A.  Correct.**
11  Q.  And as far as you know, you don't know if
12  that generates any other reports, but that's the
13  report you generate?
14  **A.  That's correct.**
15  Q.  Do you ever see any reporting that comes
16  back to you from that APD report system?  Like do you
17  get any kind of e-mails that say, all right, here's
18  the arrest reports you filed today for you to check
19  on, nothing like that?
20  **A.  No.**
21  MS. SILVERMAN:  If we could take a
22  break for just a few minutes so I can see if there's
23  any other questions I need to ask.  If we could just
24  take a short break.
25  MS. EDWARDS:  Do you need the room?

72

1  MS. SILVERMAN:  That would be fine.
2  (RECESS 3:23 p.m. - 3:29 p.m.)
3  Q.  (BY MS. SILVERMAN)  Did you do any field
4  sobriety test on Grady Bolton?  You've mentioned the
5  description of what you saw that might be
6  intoxication, so I'm just wondering if you did any
7  field sobriety test?
8  **A.  No.**
9  MS. SILVERMAN:  That was my last
10  question.
11  MS. EDWARDS:  Okay.  We will see y'all
12  same time tomorrow.
13
14
15
16
17
18
19
20
21
22
23
24
25

Manuel S. Jimenez - 12/19/2017

---

73

1          CHANGES AND CORRECTIONS
2  MANUEL S. JIMENEZ - December 19, 2017    VOLUME 1
3  [DISREGARD IF WAIVED]
4
   Reason Codes:  (1) to clarify the record; (2) to
5  conform to the facts; (3) to correct a transcription
   error; (4) other (please explain).
6  PAGE/LINE  CHANGE                 REASON CODE
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

---

74

1          SIGNATURE
2
3        I, MANUEL S. JIMENEZ, have read the
4  foregoing deposition and hereby affix my signature
5  that same is true and correct, except as noted above.
6
7
8    _____
     MANUEL S. JIMENEZ
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

75

1      IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF TEXAS
2              AUSTIN DIVISION
3
   GRADY BOLTON,          §
4                         §
                          §
5                         §
     Plaintiff,           §
6                         §
                          §
7                         §
                          § CIVIL ACTION NO.
8  VS.                    § 1:17CV00077
                          §
9                         §
                          §
10                        §
   CITY OF AUSTIN, ET AL.,  §
11                        §
                          §
12   Defendants.          §
13
14  * * * * * * * * * * * * * * * * *
15        REPORTER'S CERTIFICATION
           ORAL DEPOSITION OF
16          MANUEL S. JIMENEZ
               VOLUME 1
17          December 19, 2017
   * * * * * * * * * * * * * * * * *
18
19     I, BRENDA J. WRIGHT, Certified Shorthand
20  Reporter in and for the State of Texas, hereby certify
21  to the following:
22     That the witness, MANUEL S. JIMENEZ, was duly
23  sworn by the officer and that the transcript of the
24  oral deposition is a true record of the testimony
25  given by the witness;

---

76

1      I further certify that pursuant to Federal
2  Rules of Civil Procedure, Rule 30(e)(1)(A) and (B) as
3  well as Rule 30(e)(2) that the signature of the
4  deponent:
5      __X_ was requested by the deponent and/or a
6  party before completion of the deposition and is to be
7  returned within 30 days from date of receipt of the
8  transcript.  If returned, the attached Changes and
9  Corrections and Signature pages contain any changes
10 and the reasons therefor;
11     ____ was not requested by the deponent and/or a
12 party before the completion of the deposition.
13     That $_____ is the deposition
14 officer's charges for preparing the original
15 deposition transcript and any copies of exhibits,
16 charged to PLAINTIFF;
17     That pursuant to information given to the
18 deposition officer at the time said testimony as
19 taken, the following includes all parties of record:
20 For the Plaintiff:
       Ms. Daphne Pattison Silverman
21     THE SILVERMAN LAW GROUP
       501 North IH-35
22     Austin, Texas 78702
       512-485-3003/512-597-1658 (fax)
23     rwhitmarshwilson@gmail.com
24
25

---

Manuel S. Jimenez - 12/19/2017

```
                                                              77
 1  For the Defendants:
        Ms. Chris Edwards
 2  CITY OF AUSTIN LAW DEPARTMENT
        301 West Second Street
 3      Fourth Floor
        Austin, Texas 78701
 4      512-974-2268
        chris.edwards@austintexas.org
 5      carol.smith@austintexas.org
 6      I further certify that I am neither attorney
 7  nor counsel for nor related to nor employed by any of
 8  the parties to the action in which this deposition is
 9  taken;
10      Further, I am not a relative nor an employee of
11  any attorney of record in this cause, nor am I
12  financially or otherwise interested in the outcome of
13  the action.
14      Certified to me this 16TH day of JANUARY,
15  2018.
16  _____
        BRENDA J. WRIGHT, Texas CSR No. 1780
17      Expiration Date:  12-31-18
        WRIGHT WATSON & ASSOCIATES
18      Firm Registration No. 225
        Expiration Date:  12-31-19
19      1250 S. Capital of Texas Highway
        Building 3, Suite 400
20      Austin, Texas 78746
        512-474-4363/512-474-8802 (fax)
21      www.wrightwatson.com
22  JOB NO. 171219BJW
23
24
25
```